ROBERT P. CROWLEY AND MARY D. CROWLEY, HUSBAND AND WIFE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

CITY FEDERAL SAVINGS AND LOAN ASSOCIATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 65397, 67584. Filed May 31, 1960.

*Louis L. Meldman, Esq.,* and *Sherwin C. Peltin, Esq.,* for the petitioners.

*Walter T. Hart, Esq.,* and *James T. Wilkes, Jr., Esq.,* for the respondent.

DRENNEN, *Judge:* This consolidated proceeding involves deficiencies in income tax and additions to tax determined against petitioners as follows:

| Docket No. | Petitioner | Year | Deficiency | Additions to tax, I.R.C. 1939, sec. 294(d)(2) |
|---|---|---|---|---|
| 65397 | Robert P. and Mary D. Crowley | 1952 | $23,802.16 | $1,428.13 |
|  |  | 1953 | 25,043.96 | 1,502.64 |
|  |  | 1954 | 1,439.09 |  |
| 67584 | City Federal Savings and Loan Association | 1953 | 11,090.69 |  |
|  |  | 1954 | 7,084.94 |  |

The issues for decision are: (1) Whether the income reported by the Crowley Company in 1952 and 1953, a purported partnership of the individual petitioners' children, is attributable to and includible in the income of individual petitioners Robert P. and Mary D. Crowley; (2) whether income from abstract and title policy commissions reported by the Crowley Company and Crowley Corporation in 1953 and 1954, respectively, is attributable to and includible in the income of the City Federal Savings and Loan Association for these years; and (3) whether certain expenditures made in 1952, 1953, and 1954 by Robert P. and Mary D. Crowley are deductible as business expenses. The additions to tax under section 294(d)(2), I.R.C. 1939, are dependent on our decision on the primary issues and are not otherwise in controversy. Should we sustain a deficiency against City Federal Savings and Loan Association, respondent on reply brief has conceded that the additional income attributable to the association would entitle it to further credit its reserve for bad debts in accordance with sections 23(k), I.R.C. 1939, and 593, I.R.C. 1954. Such an adjustment, as well as others arising out of additional concessions by both parties, would be resolved under Rule 50.

FINDINGS OF FACT.

Some of the facts have been stipulated and are incorporated herein by this reference.

Petitioners Robert P. Crowley and Mary D. Crowley, husband and wife, residing at 4616 North Wilshire Road, Milwaukee, Wisconsin, filed joint individual income tax returns for calendar years 1952, 1953, and 1954 with the district director of internal revenue at Milwaukee, Wisconsin.

Petitioner City Federal Savings and Loan Association, hereafter referred to as City, is a corporation organized and existing under the Home Owners Loan Act of 1933 with its principal office located in Milwaukee, Wisconsin. A domestic building and loan association subject to the provisions of sections 23(k) and 593, I.R.C. 1939 and 1954, respectively, City filed its Federal corporation income tax returns for calendar years 1953 and 1954 with the district director of internal revenue at Milwaukee, Wisconsin.

City, with total withdrawal savings accounts in 1953 and 1954 of $8,115,553.52 and $8,721,528.37, respectively, was organized in 1935 by Robert and Mary Crowley. Robert, to whom the term "petitioner" shall hereafter refer, an attorney, has been an officer and director since its organization. Since the year 1948 and through 1954, he was president and principal executive officer. Mary was a director during the years here in issue. Under the charter issued by the Federal Government, voting rights in City were vested in the holders of its savings accounts and its borrowers, who are designated members. Voting by proxy was authorized and any number of members present at a regular meeting constituted a quorum. Blanket proxies were solicited and obtained from approximately 40 per cent of the new members of City and were kept in City's files for utilization at its annual meetings. During the period in question petitioner voted arbitrary numbers of these proxies—1,583 in 1952, 3,000 in 1953, 1,800 in 1954—for voting control of the annual meetings. Petitioner and Mary, as individual members of City, each were entitled to the maximum number of 50 votes per member.

City's principal business was that of lending money secured by first mortgages on improved realty. Its loans, in almost all cases for periods exceeding 1 year, numbered 355 in 1952, 333 in 1953, and 309 in 1954. City's lending activities generated a substantial amount of subordinate and related business, the disposition of which petitioner, as City's chief executive officer, controlled. Like many chief officers of savings and loan associations he could direct to whomever he chose the placement of realty insurance, appraisals, abstracts and title insurance policies, and allied legal work. The Manual of Rules and Regulations for the Federal Savings and Loan System provided that fees for these services be charged to and collected from the borrowers. Such charges were, in turn, to be paid "to any persons, including any such [association] director, officer, employee, attorney or firm" rendering the services for which the charges were made.

As a federally chartered savings and loan association, City's operations were subject to the regulations and supervision of the Federal Home Loan Bank Board. Periodic inspections by board examiners resulted in no significantly pertinent objections being taken to the activities of City herein involved.

Petitioner and Mary are the parents of four children: Robert P. Crowley, Jr., hereafter referred to as Robert, Clara, David, and Paul, who in 1952 were 19, 16, 14, and 10 years of age, respectively. During 1951, petitioner and Mary discussed the possibility of creating a partnership comprised of the four children. The discussions culminated on January 2, 1952, in the execution of the following instrument by Mary and son Robert:

WHEREAS, MARY D. CROWLEY and ROBERT P. CROWLEY, JR. have heretofore operated an insurance and real estate loan business and have engaged in related activities, including the making of real estate appraisals; and

WHEREAS, it is the intention of the said Mary D. Crowley and Robert P. Crowley, Jr. to assign and transfer all of their interest in said business to Mary D. Crowley, as Trustee for Clara E. Crowley, Robert P. Crowley, Jr., David V. Crowley and Paul V. Crowley, each of such beneficiaries to have an undivided one-fourth (¼) interest as partners in the assets of said business and the income derived therefrom; and

WHEREAS, the said Robert P. Crowley, Jr. is under the age of twenty-one (21) but is nevertheless an emancipated minor; and the said Clara E. Crowley and Paul V. Crowley and David V. Crowley are unemancipated minors,

Now, THEREFORE, in consideration of mutual love and affection, and in consideration of the covenants hereinafter set forth, the undersigned Mary D. Crowley and Robert P. Crowley, Jr. assign, transfer and set over all of their right, title and interest in and to the insurance and real estate loan and appraisal business, and such related business operated by them, unto Mary D. Crowley as Trustee for Clara E. Crowley, Robert P. Crowley, Jr., David V. Crowley and Paul V. Crowley, each of such beneficiaries to own an undivided one-fourth (¼) share of the assets of said business and the income derived therefrom; and in the event of the death of any one of them, the share of such deceased person shall be divided equally among the survivors; on condition that the said Mary D. Crowley, Trustee, shall perform the following functions:

1. That said Trustee shall operate said business for and on behalf of said beneficiaries in the name of THE CROWLEY COMPANY, which shall be a family partnership.

2. That the said Trustee shall keep accurate books of account and proper records in connection with the operation of said business, and shall make an annual accounting of the financial transactions and affairs of the business.

3. That the said Trustee shall maintain a bank account in a reputable bank in the County of Milwaukee for the deposit and withdrawal of moneys incidental to the operation of the business.

4. That the said Trustee shall have the authority to execute any and all satisfactions of mortgages or any other legal instruments necessary and incidental to the operation of said business.

Such assignment and transfer by the undersigned is upon the further condition that in the event of the death of Mary D. Crowley or in the event of her absence or inability to perform her duties as such Trustee, Robert P. Crowley may act as Trustee with the same rights, privileges and obligations as are conferred upon the said Mary D. Crowley.

Prior to 1952, each of the children had in his or her name maintained a savings account in City in an amount of at least $2,000, the three younger children having derived their funds beginning early in 1950 from gifts from their parents, and Robert, from his own earnings. In April 1952, $2,000 was withdrawn from each of the children's accounts and invested in the Crowley Company, hereafter referred to as Company. No investment or personal drawing account appeared on the books of Company in the name of Mary, either as an individual or as trustee, or in the name of petitioner.

Beginning on April 15, 1952, petitioner and Mary loaned Com-

pany $135,000 during 1952, and $11,500 during 1953. Each of the loans was evidenced by demand notes payable to petitioner and Mary and bearing interest at 2½ per cent per year. During 1953, Company repaid to petitioner and Mary $22,500. The notes were the only outstanding liabilities of Company in 1952 and 1953. As of January 2, 1954, the books of Company recorded notes payable and outstanding in the amount of $124,000.

The drawing or personal accounts of the children carried on the books of Company as of January 2, 1954, attributed $12,403.76 to Robert, $12,414.27 to Clara, $12,425.33 to David, and $12,425.85 to Paul. During 1952 and 1953, the only moneys recorded as being drawn and charged against their accounts were to pay their State and Federal income taxes and, in the case of Robert, an additional $200 each year for university tuition. Except for the foregoing charges, the income from the business was accumulated in their respective accounts.

On January 2, 1954, the Crowley Corporation was organized in Milwaukee, Wisconsin, to take over the business of Company. The business was conducted by the Corporation in the same manner it had been conducted by Company, except as hereinafter noted. The Corporation received the assets and assumed the liabilities of Company, and stock in the amount of $5,000 was issued to each of the four children. On the books of the Corporation the amount of the accounts carried in the name of each of the four stockholders was reduced by $3,000, which was added to their original investments in Company, making a total equity investment for each of the four stockholders of $5,000. The balance of the accounts carried in the names of the four stockholders was recorded as notes payable to the respective stockholders. During 1954, the Corporation repaid notes to the extent of $40,500 to petitioner and Mary, and $9,000 to Clara. Also in 1954, the Corporation paid interest totaling $3,872.96 on its notes payable to petitioner and Mary, to Robert, and to Mary as trustee for Clara, David, and Paul.

The business address of Company and the successor Corporation, both of which are hereafter included in references to "Company," was the address of the Crowley family residence. The books and accounts of Company were located at City. Frances Felten, an officer and employee of City, independently of her duties for City, performed the bookkeeping and maintained the records of Company, for which she was compensated $150 during 1952 and 1953.

The activities of Company from which its income was derived during 1952 through 1954 fell into four general categories. These were appraisal and inspection fees, insurance commissions, abstract

and title policy commissions, and loan commissions and interest. Company reported the following income from its activities:

CROWLEY COMPANY

|  | 1952 | 1953 |
|---|---|---|
| Appraisal fees | $7,001.25 | $7,710.25 |
| Insurance commissions | 12,168.90 | 13,073.49 |
| Abstract and title policy commissions | 1,723.39 | 1,754.44 |
| Loan commissions | 9,253.00 | 9,367.00 |
| Interest | 4,733.86 | 10,886.67 |

CROWLEY CORPORATION

|  | 1954 |
|---|---|
| Appraisal fees | $959.50 |
| Insurance commissions | 11,191.92 |
| Abstract and title policy commissions | 1,343.80 |
| Loan commissions | 4,159.50 |
| Interest | 10,350.21 |

The loan commissions and interest were derived from loans made directly by Company with funds for the most part borrowed from the individual petitioners. The appraisal fees resulted from the appraisal activity of Robert in connection with the lending and mortgage activities of both City and Company. The insurance commissions and the abstract and title policy commissions were generated by the lending activities of City.

Robert had for several years prior to 1952 been learning the technique of appraising property from his father. By 1952 he apparently was deemed to be a qualified appraiser. On January 16, 1952, the board of directors of City adopted the following resolution:

RESOLVED, that Robert P. Crowley, Robert P. Crowley, Jr., Frank F. Drolshagen and David G. Delahunt be and they hereby are designated the appraisal committee. It shall be the duty of this committee to make appraisals of property offered as security for each loan made by this association and to make appraisals of such other property as the Board of Directors may direct. No loan shall be made upon the security of a lien upon real estate, except after the written, signed appraisal of one or more members of the appraisal committee of the property upon which the loan is to be made.

The appointments so effected conformed to the Manual of Rules and Regulations for the Federal Savings and Loan System, which provided in part as follows:

Sec. 145.6–9 *Appraisals.* No loan shall be made by any Federal association until at least two qualified persons designated by its board of directors shall have submitted a signed appraisal of the real estate security; or, if an insured or guaranteed loan, until two qualified persons designated by the board of directors (one of whom may be the appraiser accepted by the insuring or guaranteeing agency) shall have concurred in or approved, in writing, the valuation assigned to the real estate security by the appraiser accepted by the insuring or guaranteeing agency: * * *

On January 2, 1952, City entered into an agreement with Company which provided for the employment of Company as an appraiser

and that it was to be paid one-half of the appraisal fee for each appraisal made of property on which City ultimately loaned money. This agreement was effective during 1952 and 1953. In January 1953, the directors of City again designated Robert and petitioner, among others, to be the appraisal committee. In December 1953, the board by resolution noted that Robert and petitioner both had been making all of the appraisals for City, and that Robert had received one-half of the appraisal fee for each appraisal participated in by him and this arrangement was approved by the board. In 1954, after the Corporation was formed, the board of directors of City by resolution again designated petitioner and Robert as an appraisal committee and reaffirmed the prevailing arrangement whereby the fees were to be divided evenly between them.

All of the properties on which loans were applied for at City were viewed and appraised initially by Robert. Robert culled out those properties which were unsatisfactory to support a loan, and petitioner would then go out either with or without Robert to view the remaining properties and to finally determine whether the loan should be approved. Each approved loan application contained an appraisal certificate which in every case was signed by both petitioner and Robert. The fees to be received by the appraisers for their work were charged by City to the borrower upon closing of the loan. These fees were held by City in an escrow account, from which one-half would be paid out to petitioner and the other half to Robert or Company. Robert also appraised property on which Company itself made loans. Of the appraisal fees received by Company totaling $7,001.25 and $7,710.25 in 1952 and 1953, respectively, $4,269.75 in 1952 and $5,061.25 in 1953 were from appraisals in connection with loans made by City; the remaining appraisal fees arose out of loans made directly by Company. During 1952 and 1953, all appraisal fees received by Robert were turned over to Company. During 1954, following incorporation, Company received no income with respect to appraisals made by Robert for City. Although Robert continued his appraisal activities for City during that year, he collected and retained all of the fees and reported them as personal income. Company, however, did receive and report in 1954 appraisal and inspection fees of $959.50 arising out of its own loans.

All of the insurance arranged for by City on behalf of its mortgagors was placed through Robert, who was a subagent to four general insurance agents. Robert had since 1950 or 1951 been licensed to sell insurance in Wisconsin and had been receiving commissions since then on insurance written for City's borrowers. On December 10, 1951, just prior to the formation of Company, the board of directors of City resolved that City's insurance coverage

for mortgages held by it "may be placed through The Crowley Company," and on January 2, 1952, simultaneously with Company's creation, City "employed" Company to "write and service insurance coverage for mortgages held by the Association." This agreement was effective through 1952 and 1953; in January 1954, it was renewed with the newly organized Corporation. Robert was the only licensed agent of Company; Company held no insurance license of its own.

City, in accordance with Federal Home Loan Bank Board rules, required mortgagors to insure the property upon which City loaned money. The appraisal or loan committee would determine the amount of coverage. If the borrower did not insist on placing his own insurance, and most did not, either City would give the necessary information to Robert, who in turn would telephone the general agents, or occasionally one of the girls in City's office would telephone the order in Robert's name directly to the general agent. The policies were then delivered to Robert, at which time he would file them in the borrowers' file at City. City was required to keep the original policies. The initial premiums were collected by City from the borrower at the time of closing and placed in an escrow account. From that account City would either remit the premium directly to the general agent, and the latter would return to Robert or Company the subagent's commission, or City would remit the entire commission to Company which would deduct the subagent's commission and forward the balance to the general agent. City itself neither received nor paid any commission in connection with the placement of insurance. As a Federal savings and loan association it was not permitted to sell insurance.

The third category of Company's income was abstract and title policy commissions. The title and abstract company allowed discounts to whoever applied to it for a title insurance policy and/or abstract extension. City, in connection with the closing of its loans, required title insurance and an extended abstract covering the mortgaged property. Orders for abstract extensions and title insurance were placed by letter or telephone either by Company or by City's clerical employees, but in Company's name. Abstracts and other necessary documents were then delivered to the Title Guaranty Company of Wisconsin by Robert or one of the other Crowley children or, occasionally, directly by City employees.

The abstract and title policy fees were charged to the borrower, and were collected by City at closing and put into an escrow account. City forwarded this money to Company by monthly check. The title company billed Company, and since Company was the applicant for the abstract extension and title insurance, it would be

allowed the discount. During 1952, the title company maintained an account in the name of Robert, which was changed in December 1952 or January 1953 to the name of Company, and in January 1954 to that of the Corporation. Another account recorded in the name of City indicated 16 billings totaling $77.50 during 1952 and 1953. The charges made to this account, however, probably resulted from errors by employees of the title company or others ordering preliminary abstract reports who had presumed that City, rather than Company, was the applicant for the abstract extension or title policy. Sometime in 1953 a note was entered on City's account card to the effect that all charges should be billed to Company. Petitioner had had no account with the title company, but in the years prior to 1952, an account existed in Mary's name, the last charge to which was dated January 11, 1951.

Payment on orders placed with the title company was due by the 20th of the month following the date of the charge. The title company looked to the applicant for payment and allowed discounts only to the applicants. On orders placed by Company or in its name, the title company looked to Company for payment and had no recourse to either City or petitioner for payment of its charges for abstract extensions or title insurance. In addition to City's loans, a relatively small number of Company's own loans accounted for a portion of the abstract and title policy commission income.

The procedures followed by City and Company with respect to abstract extensions and title policies are the customary procedures in localities in this area where title companies allow discounts.

The direct lending activities of Company accounted for its last type of income. With the $8,000 of capital invested by the Crowley children and the total of $146,500 loaned Company by petitioner and Mary, Company executed 38 loans totaling $293,000 during 1952, 38 totaling $299,900 during 1953, and 17 totaling $139,250 during 1954. Following the pattern established during a 10- or 12-year period by petitioner and Mary prior to the formation of Company and involving essentially the same borrowers, Company made only temporary loans, not exceeding a year, to realtors or persons controlling real estate firms. In contrast to City's loans, generally limited to high-equity first mortgage loans of long duration, Company's loans were in many cases secured by second mortgages or vacant land. Company received 6 per cent interest on these loans and, in addition, received at closing loan commissions for placement of the loans. City made a substantial portion of the permanent loans generated by the ultimate sale of the property by the realtors.

During the years involved contact for these short-term loans was made through Robert, who at times sought the advice of and con-

sulted with his father with respect thereto. The only connection of record that petitioner had with Company during the years 1952 through 1954 was his services to Company as an independent attorney rendering legal opinions as to the title of property on which Company made its loans. Petitioner received and reported as income the full fee that Company charged and collected from the borrower for such legal services.

In 1952, when Company was formed, Robert was 19 years old. For the period 1952 to 1954, he attended Marquette University as an undergraduate student and carried a full schedule. He entered law school in the fall of 1954, and graduated in 1957. During the summers of 1952 and 1953, and occasionally at other times during those years, he was employed by City to do general office work and to assist in the closing of loans. It was usually on the weekends that he went out to appraise properties.

Prior to 1952, petitioner and Mary had engaged in the temporary loan business for about 10 or 12 years, most of the loans being made by Mary. Through the years prior to 1952, Mary had held a license to operate as an insurance agent in Wisconsin and, up until January 1951, had been earning abstract, title policy, and insurance commissions. Petitioner had for a number of years prior to 1952 appraised property and earned individual fees therefrom, as he also did during the years in issue. Notwithstanding the provision in the agreement of January 2, 1952, wherein Mary was empowered to operate the business, she took no active part in the conduct of the business of Company.

Respondent in his notice of deficiency disregarded Company for the years 1952 and 1953, and determined that all of Company's income was taxable to petitioner and Mary. Respondent in his notice of deficiency to City also determined that most of the same income was includible in City's income for the years 1953 and 1954.

#### ULTIMATE FINDINGS.

No part of Company's earnings during the years 1952 and 1953 is attributable to or taxable to the individual petitioners, except loan commissions and interest income on loans made by Company. The individual petitioners are taxable on the loan commissions and interest income received and reported by Company in the years 1952 and 1953 from loans made by Company. No part of Company's earnings during the years in issue is attributable to or taxable to City.

The individual petitioners are entitled to deduct as business expense for each of the years in issue $75 for postage and supplies; they are not entitled to deduct as business expense any amounts for

entertainment and miscellaneous expenses or for use of their own automobile.

OPINION.

We direct our attention first to respondent's contention that the individual petitioners are taxable on all the income of Company, the partnership, for the years 1952 and 1953. Respondent did not attempt to tax similar income of Company's successor Corporation to petitioners in 1954.

Details with respect to the sources of this income, consisting of appraisal and inspection fees, insurance commissions, abstract and title policy commissions, and loan commissions and interest, and activities connected therewith appear in our Findings of Fact.

Respondent contends that the partnership lacked substance and was a sham, that petitioner, through his control of City and his children, earned and controlled the income received by the partnership and is therefore taxable on it under section 22(a), I.R.C. 1939, and the principles announced in *Lucas* v. *Earl*, 281 U.S. 111; *Helvering* v. *Clifford*, 309 U.S. 331; and *Commissioner* v. *Culbertson*, 337 U.S. 733. Petitioner claims that the partnership was properly organized as a separate partnership and independently engaged in these business activities, that the necessary capital was contributed by the Crowley children and neither of the petitioners contributed any capital or owned any interest therein, that the business of the partnership was actively conducted and controlled by one of the partners, Robert Crowley, Jr., and neither of the petitioners exercised any management or control over the business, nor performed any services for which they were not compensated, and had no connection or relationship with the partnership which warrants taxing its income to petitioners.

Respondent would have us look at this case as involving a family partnership problem and discusses each of the several factors mentioned in the Supreme Court opinion in the *Culbertson* case for determining whether a partnership between members of a closely related group will be recognized for tax purposes. This is not the typical family partnership pattern where a member of the family brings other members of the family into a partnership in order to dilute the transferor's interest, but without diminishing his authority, dominion, or control over the business or assets. *William S. Bein*, 14 T.C. 1144. Petitioner here, to whom the partnership income is sought to be attributed, was not a partner and had no interest in the partnership income as such. And we are not here concerned with the taxation of the income as between the children, which so far as we know respondent has not questioned. Even if

this partnership did not meet the criteria of the *Culbertson* case for recognition of the partnership for *tax* purposes, that would not necessarily mean that petitioner is taxable on the income received by the partnership. The partnership provisions of the Internal Revenue Code, sections 181 and 182 of the 1939 Code, are not involved here.

The answer to our question rests on the basic theory of income taxation—that income must be taxed to him who earns it—and must be answered by determining whether the individual petitioners, either through their efforts or the use of their capital, earned this income so as to be taxable thereon under sections 11 and 22(a), I.R.C. 1939, even though they did not receive it.

Except as noted below, this case does not fit into the pattern of *Lucas* v. *Earl, supra; Helvering* v. *Horst,* 311 U.S. 112; and *Helvering* v. *Eubank,* 311 U.S. 122, involving anticipatory assignments of income; nor into the pattern of *Helvering* v. *Clifford, supra,* wherein income from capital was sought to be shifted to another member of the family through the device of a trust with the transferor retaining complete dominion and control of the income-producing property. Except in the case of Company's short-term lending activities, which will be discussed later, capital was not an income-producing factor. And the evidence does not support a claim that petitioners were the true owners of Company and taxable on its income as such. When Company was incorporated in 1954 with the children as the only stockholders, respondent made no effort to tax the corporate income to petitioners in that year.

Respondent predicates his position on the theory that most of Company's income was generated by City's lending activities, all of which he claims were controlled by petitioner, that the activities which produced Company's income had all been conducted by petitioner or his wife prior to formation of Company, that Robert's activities in behalf of Company were insignificant, and therefore petitioner earned the income and is taxable thereon. We must decide this case on the evidence before us, and we think that evidence supports petitioner's contention rather than respondent's, except with respect to Company's short-term loan business.

Respondent stresses the control of petitioner over the lending activities of City and his power to direct business generated by City to Company. Notwithstanding petitioner's protestations to the effect that City was subject to rigorous Federal regulation and that the thousands of proxy votes held by petitioner could have at any time been revoked, it is obvious from the record that for all practical purposes petitioner was in control of City's activities. As chief executive officer he unquestionably was in a position to direct City's

subsidiary business to whomever he chose, including himself in an individual capacity. Possession of such control over the business, however, is not to say that he is responsible for the income arising therefrom. There is a difference between being in a position to control who shall perform the activities which produce the income and being in a position to control either the use of income-producing capital or who shall receive income after it is produced, and we think that distinction is basic in this case. This income was not generated until earned by the actual performance of the subsidiary services. The control exercised by petitioner was limited to that of designating who should perform the services.

Because petitioner could have himself performed the services and thereby have earned the resulting income, but chose instead to permit another to perform and earn the income, is not the type of dominion and control condemned by the *Lucas, Clifford*, and *Culbertson* cases. In *Seminole Flavor Co.*, 4 T.C. 1215, we held that a close corporation was not taxable on income earned by a partnership of the stockholders engaged in activities separated from and related to those of the corporation, and said at page 1235:

Actually, the principal force behind all of the Commissioner's argument is that the petitioner could as well have done all the things that the partnership did and reaped all of the earnings of the related enterprises. Since petitioner could have had the earnings, the Commissioner would make it so by exercising the authority conferred by section 45. * * *

"The answer, however, to this argument is that petitioner did not do this. * * *"

To conclude otherwise would mean that every corporate executive in a position to determine who shall provide materials or services for his corporation might be subject to tax on the profit generated by such contract for material or services. To be taxable on the income produced, petitioner must have either performed the income-producing activity himself or have at least had an interest in and control of the entity that actually conducted the income-producing activity. Petitioner's control of City would not alone qualify.

The evidence with respect to the appraisal income is that Robert had been making appraisals for City either alone or with his father for some time prior to 1952, that this fact was known to the Federal Home Loan Bank Board examiners, who scrutinized City's business conduct, and they found no reason to object thereto, that Robert and petitioner, along with several others, were formally appointed by the directors of City as members of City's appraisal committee for the years 1952 and 1953 and the work done by them for City was formally approved by the board of City each year, that 50 per cent of the appraisal fees collected by City was paid over by City to petitioner, and the other 50 per cent was paid over

to Robert who turned it over to Company. Some of the appraisal income of Company was in the form of appraisal fees collected by Company in connection with its own loans. The evidence indicates that by 1952 at least, Robert was considered to be a competent appraiser and that his services in this connection warranted the appraisal income paid to him.

With respect to the insurance commissions included in Company's income, the evidence is that petitioner had not had an insurance license for a number of years, that petitioner's wife did have an insurance license, although there is no indication that she had used it in recent years, that Robert had been licensed as an agent for several insurance companies as early as 1951, and that Robert was authorized to accept orders for insurance and was entitled to receive and did receive commissions therefrom. There is some evidence that employees of City handled some of the details involved in having the insurance policies issued, but it was important to City to know that properties upon which it loaned money were properly covered by insurance, and as a Federal savings and loan association it was not permitted to sell insurance itself. While there does not appear to have been a great deal of work involved in earning this type income, there was probably as much as would be required of any unrelated subagent in ordering insurance under similar circumstances. There is no more reason that petitioner should have designated his wife or someone else to receive these commissions rather than his son, and the mere fact that the person designated was his son does not make petitioner taxable on the income produced thereby.

The abstract extension and title policy commissions appear from the evidence to have been a discount or rebate allowed by the title company to those who ordered the abstract or title policy. This income originated with the title company. The title company had not carried an account in the name of petitioner, at least since 1951, and while it did carry an account for petitioner's wife, there had been no activity in that account since January 1951. Discounts had been allowed to the account of Robert or the Crowley Company since 1951. The fact that petitioner, by virtue of his dominant position in City, whose lending activities generated this business, could probably have directed that these discounts be credited to him personally, does not justify taxing the income to him. Having once designated who should obtain the abstract extensions and title policies for City, there is no evidence that petitioner thereafter personally performed any services in connection therewith.

Even if the evidence supported respondent's contention that petitioner was conducting the above three business activities and receiving the income therefrom immediately prior to formation of

Company, we know of nothing which would prevent petitioner from disposing of his interest in such business to related parties, by gift or otherwise, without subsequently being held accountable for the income produced therefrom, particularly where the business disposed of involved the rendering of services and no capital was transferred. Such was approved in the companion cases of *Willis H. Vance*, 14 T.C. 1168, and *William S. Bein, supra*, even though income-producing properties were also transferred. If after transferring such business, the transferor retained no dominion or control over the income-producing activities, and performed none of the services which gave rise to the income, he would not be taxable on the income produced thereby. We conclude that petitioner is not taxable on any of the income received by Company from the three activities discussed above.

We think the opposite conclusion must be reached with respect to the income received by Company from its short-term lending activities. The evidence indicates that petitioner and his wife had engaged in the short-term lending business with their own funds and with virtually the same borrowers for a number of years prior to the formation of Company. After formation of Company, petitioners individually loaned Company practically all of the money used by Company in making these short-term loans. The sums advanced by petitioners to Company for this purpose totaled $146,500 during the years 1952 and 1953, whereas the total capital of Company was $8,000. Petitioners loaned this money to Company on demand notes at 2½ per cent interest, and Company loaned it out at 6 per cent interest. Unlike the income previously discussed which resulted from performance of services, however meager, the loan commissions and interest received by Company arose from the use of the parents' capital by or for the benefit of the children, without the parents actually relinquishing ownership or control over the capital. It would be closing our eyes to realities to think that petitioners could not have and would not have continued to make these loans direct and received the commissions and full 6 per cent interest had it not been for the close family relationship. We do not think this arrangement for diversion of income from the parents meets the test of bona fides when subjected to the close scrutiny justified when examining transactions between members of the same family. We hold that petitioners are taxable on the loan commissions and interest received by Company on the short-term lending activities, against which the 2½ per cent interest paid by Company to petitioners should be credited. *Commissioner* v. *Sunnen*, 333 U.S. 591; *Helvering* v. *Horst, supra; Paster* v. *Commissioner*,

245 F. 2d 381 (C.A. 8), affirming T.C. Memo. 1956-144, certiorari denied 355 U.S. 876.

Respondent, in his skepticism over the extent of Robert's services, notes that during the years involved Robert was a full-time student at Marquette University. This is true, but the university was located in the city in which Robert lived and in which he conducted his business activities, and his and petitioner's testimony stand to the effect that he worked on weekends and for a limited number of available hours during the week. Robert testified at length at the trial, and we had an opportunity to observe him on the witness stand. The manner in which he testified and his testimony, even taking into consideration the passing of time, convinced us that he might well have been capable of conducting these activities in 1952, particularly when supported by the testimony of an examiner for the Federal Home Loan Bank Board that he knew of Robert's appraisal activities in behalf of City and raised no objection thereto.

Respondent also asserts that petitioner controlled the income derived from Company's activities and used it to discharge his obligations toward the children. The record is to the contrary. The only charges that were made against the children's accumulated income were for Federal and State taxes on their income and for Robert's university tuition, the latter amounting to $200 per year. And upon formation of the Corporation all of the accumulated income was transferred to the Corporation in exchange for stock and accounts payable issued to the children.

The second issue involves the additional income charged to the corporate petitioner, City Federal Savings and Loan Association. In his notice of deficiency respondent added to taxable income of City for the year 1953 loan commissions, appraisal fees, insurance commissions, and abstract and title policy commissions reported by Company and, for the year 1954, the same items reported by the Corporation plus appraisal fees reported by Robert. At the trial and on brief respondent concedes that none of such income should be included in City's taxable income except the abstract and title policy commissions reported by the partnership and the Corporation in 1953 and 1954, respectively. Respondent argues that inasmuch as the work done in generating the latter income had been accomplished by City when it closed a loan and required the borrower to purchase an abstract extension or title policy, such income was taxable to City under sections 22(a) and 61, I.R.C. 1939 and 1954, respectively, citing *Lucas* v. *Earl, supra*. Respondent relies on *Estate of Esther M. Stein*, 25 T.C. 940, affirmed per curiam sub nom. *Levine* v. *Commissioner*, 250 F. 2d 798 (C.A. 2); *Miller-Smith Hosiery Mills*, 22 T.C. 581; *Essex Construction Co.*, 12 T.C. 1212,

to justify taxing this income to both City and the individual petitioners.

In our opinion this income is not taxable to City under the facts we have before us. As previously noted, this income originated with the title company and it could direct to whom it was payable. While it is true that City's requirement that the borrower provide an abstract extension or title insurance generated this business for someone, this did not produce the discount income. That was produced by placing the order with the title company and handling the necessary servicing details. Some of these details may have been handled by employees of City incident to taking a loan application, but the evidence is that Company usually did most of the service work, the orders were placed in Company's name, the title company looked solely to Company for payment of the abstract or title insurance fee, and Company received the discount and accounted for it in its own income while City had no separate account for the discount income, and neither City nor any substantial stockholder of City ever received the income.

The fact that City could have kept this business for itself does not mean that it did and is taxable on the income therefrom. There are numerous cases in which this and other courts have recognized that segments of what might have been an integrated business may be handled by separate taxpayers, and this is so even where one of the taxpayers may be the owner of all or most of the stock of the other. *Moke Epstein, Inc.*, 29 T.C. 1005; *Chelsea Products, Inc.*, 16 T.C. 840, affd. 197 F. 2d 620 (C.A. 3); *Miles-Conley Co.*, 10 T.C. 754, affd. 173 F. 2d 958 (C.A. 4); *Buffalo Meter Co.*, 10 T.C. 83; *Seminole Flavor Co.*, *supra; Ray Waits Motors* v. *United States*, 145 F. Supp. 269 (E.D.S.C.).

In the cases cited by respondent, the courts found that all the transactions had actually been those of the corporations involved. Such was not the situation here—the transaction was carried out in Company's name and accounted for on the books of all concerned as Company's business. Nor can this be deemed an anticipatory assignment of income. The income did not arise until the order was placed in the name of Company. This income was includible in the income of Company and was not taxable to City.

The final issue is whether certain expenditures made by petitioner in each of the years are deductible as business expense. The expenditures disallowed by respondent are for automobile expenses in the amount of $669.22 for the year 1952 and $1,132.94 for the year 1954; stationery, printing, supplies and postage in the amounts of $168, $152, and $163 for the years 1952, 1953, and 1954, respectively; and for entertainment and miscellaneous expenses in the amount of $135 for each of the years 1952 and 1953, and in the amount of $150 for

the year 1954; all of which petitioner claims as ordinary and necessary expenses of his personal legal business and/or in his job of promoting business for City. Petitioner reported substantial income from legal fees in each of these years, practically all of which was for appraising and legal work done for City or Company.

The expenditures are of a nature and in amounts that might well be allowable as deductions from petitioner's personal business income if proved as to amounts and as to their relationship to the business income. However, the burden of proof is on petitioner and he has failed to carry it with respect to most of these items. The evidence consists of petitioner's own testimony and certain checks drawn in payment for an automobile in 1954 and certain city and country club bills.

The amounts claimed for supplies, etc., and for entertainment are admittedly estimates, but petitioner testified that he took pains to pay for his personal business postage and supplies so other employees of City would not use City's stamps and supplies for their personal use. Proof of the entertainment expenses is limited to petitioner's rather confused testimony as to his use of two country clubs and two city clubs to maintain contacts for City, which would ultimately result in personal business for him, and an annual party he gave at his home each year, the cost and purpose of which were not specified. On the other hand, he testified that City paid some of his club dues and expenses and also had a policy of paying its officers $175 to $200 each 6 months to cover their out-of-pocket expenditures for meetings, etc. Petitioner has failed to prove that he is entitled to any deduction for entertainment expense, but applying the *Cohan*[1] rule, we have found that he is entitled to a deduction of $75 in each year for postage and supplies.

Petitioner testified that his personal automobile was used 50 per cent for business, mostly on weekends. He did not specify whether such use was on City's business or on his personal business. He also testified that both City and Company owned automobiles during the years involved which were used by himself, Robert, and the Crowley family. Petitioner failed to prove that he is entitled to a deduction as a business expense of any amount for use of his own automobile.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

---

MURDOCK, *J.*, dissenting: All of the income here in question had to be earned by somebody performing the necessary work to bring it in. Robert, Jr., did the work. His father and mother did not.

---

[1] *Cohan* v. *Commissioner*, 39 F. 2d 540 (C.A. 2).

Therefore, I do not think the income is taxable to the parents. If the loans from the parents were made at less than a proper rate of interest, a proper rate of interest could be determined and the difference taxed to the parents. But the parents did not make the loans that brought in the 6 per cent interest and they should not be taxed on that amount or upon any of the other items which the Commissioner has taxed to them.

---

TURNER, OPPER, RAUM, and PIERCE, *JJ.*, would tax the income from the commissions and rebates to petitioners who directly or through their subservient agencies not only really earned the income but controlled and could at any time change its destination.