RONAN STATE BANK, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4040–72. Filed April 9, 1974.

*John R. Kline* and *David N. Niklas,* for the petitioner.
*Craig D. Platz,* for the respondent.

GOFFE, *Judge:* Respondent determined deficiencies in the Federal income taxes of the petitioner as follows:

| Calendar year | Deficiency |
|---|---|
| 1967 | $7, 656. 16 |
| 1968 | 2, 593. 55 |
| 1969 | 3, 778. 42 |
| 1970 | 3, 095. 45 |

The petitioner has conceded certain adjustments made in the statutory notice of deficiency. The only issue remaining for decision is whether income from participation in a creditors' group insurance policy was taxable to petitioner, or to petitioner's two controlling stockholders as individuals.

#### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein.

Petitioner Ronan State Bank (hereafter sometimes referred to either as petitioner or the bank) is a commercial bank incorporated under

the laws of Montana in the year 1910. At the time the petition was filed and during the years in controversy, petitioner's principal place of business was in Ronan, Mont. The town of Ronan has a population of 1,234 and is located in a county which has a population of approximately 14,000. There are two other banks in the county.

Petitioner filed its corporate Federal income tax return for the taxable year 1967 with the district director of internal revenue at Helena, Mont. Petitioner filed its corporate Federal income tax returns for the taxable years 1968, 1969, and 1970 with the Internal Revenue Service Center, Ogden, Utah.

During the years in issue, the bank was a member of the Montana Bankers Association (hereafter sometimes referred to as the association). Only national or State banks and savings associations or trust companies located and doing business in Montana were eligible for active membership in the association.

Prior to the years in controversy, the association, as a result of investigating the insurance needs of its member banks and negotiating with insurance companies with respect to providing group creditor insurance for its member banks, obtained from the New York Life Insurance Co. (New York Life) group creditor life and health insurance policies (hereafter collectively referred to as the group insurance or the group policy). During the years in controversy, petitioner was a "participating creditor" as that term is used in the group policy. The policy defines participating creditor as a creditor who is a member of the Montana Bankers Association, who elects to make coverage available to its debtors, who is reported by the association for coverage under the New York Life's group policy, and who has its eligible installment loans insured in accordance with the terms of said group policy.

As a "participating creditor," petitioner's rights, liabilities, and functions were no different than if it had been issued the policy directly because, in effect, petitioner was the policyholder along with the other participating members of the Montana Bankers Association. In its capacity as a participating creditor (policyholder) during the years in question, petitioner, through its employees, paid the premiums on the policy, solicited enrollment of the bank's debtors under the group policy, quoted the charge to the debtors, included those charges on the bank's form promissory notes signed by the debtors, collected those charges from the debtors, and issued those debtors certificates of insurance under the group policy.

The minutes of the meeting of petitioner's directors of January 12, 1960, include the following:

Discussion was had regarding the Creditors loan insurance and the fact that the Superintendent of Banks does not wish any of the State Banks to act as

agents of Insurance Companies. Whereupon it was moved, seconded and carried that H. E. Olsson be appointed as agent representing the New York Life Insurance Company in this creditor's insurance line.

The minutes of the meeting of petitioner's directors of November 9, 1965, include the following:

A discussion was had relative to creditor's loan insurance. H. E. Olsson was appointed as agent representing the New York Life Insurance Company for the bank creditor's insurance program on December 8, 1959.

On motion made, seconded and carried, D. E. Olsson, President, is appointed as co-agent along with H. E. Olsson, representing the New York Life Insurance Company. The appointment of D. E. Olsson as co-agent with H. E. Olsson was made in the fall of 1960, which through an oversight, was not shown in the corporate minutes. The appointment this date is effective as of January 1, 1961.

H. E. Olsson and D. E. Olsson, father and son, owned a controlling interest in Ronan State Bank during the period in controversy; H. E. Olsson was chairman of the board of directors and D. E. Olsson was a director and president of Ronan State Bank. Ronan State Bank and D. E. Olsson were not licensed insurance agents during the period in controversy. D. E. Olsson was a licensed life insurance agent until the year 1965. H. E. Olsson was licensed to sell life insurance until May 31, 1969, and had a multiple-line insurance agency which he sold in the late 1960's. New York Life never appointed H. E. Olsson as an agent for the company.

When an individual applied for a loan from the bank during the period in controversy, an employee loan officer of the bank would solicit the eligible borrower's request for credit life and health insurance coverage (coverage) on the loan and also quote the cost of such coverage to the prospective borrower. If a borrower requested coverage, he would sign a specific provision to that effect on the promissory note and on a separate card. In the event the customer refused the insurance, he would sign a waiver card. The bank's loan officers during the times in question were: H. E. Olsson, D. E. Olsson, Gerald Leighton, Adam Kirsch, and a Mr. Skogen, the cashier.

The borrower's total cost for the coverage over the period of the loan was set forth on the promissory note, the cost being computed during the period in controversy as follows:

| Type of loan | Age of debtor | Charge per month | Insurance coverage |
|---|---|---|---|
| Straight loans | Under 56 | $1.00 | $1,000 |
| | 56 to 66 | 2.00 | 1,000 |
| | Over 66 | 4.00 | 1,000 |
| Installment loans | | .75 | 1,000 |

The premium rates payable by petitioner under the group policy during the period in controversy were the same as set forth above, except for the rate for installment loans which was 60 cents per month per

$1,000 of insurance. The policy prohibits a participating creditor from charging a debtor an amount in excess of the maximum charge for insurance stated in the policy. During the years in question, the 75 cents charged to installment borrowers for coverage resulted in a 15-cent improper overcharge representing a portion of the income involved here. D. E. Olsson understood that the 15-cent overcharge was authorized. The total cost of the borrower's coverage reflected on the promissory note was paid by the borrower at the time the note was executed and the bank immediately thereafter mailed a certificate of insurance to the borrower.

The bank paid premiums on the group policy monthly to the association for remittance to New York Life, the monthly premiums being computed on the basis of the average volume of loans insured by the bank during the month. "Group Life Insurance Monthly Premium Statements" signed by Mrs. Akers as assistant cashier, naming Ronan State Bank as policyholder, were submitted monthly to the association by the bank during the period in controversy. All the monthly premiums were paid by checks drawn on Ronan State Bank and signed by Mrs. Akers.

The policy provides that any "divisible surplus" apportioned to the policy as a dividend shall be paid in cash to the policyholder. The "divisible surplus" is referred to herein as the experience credit refund and is similar to a dividend on the policy. What the Bankers Association does with the credit refund is within its discretion; there is no requirement that it be distributed to creditor members or refunded to debtors.

New York Life periodically made experience credit refunds to the association which would in turn, after withholding 10 percent to cover its expenses, remit the experience credit refund to its member banks, including both State banks and national banks in towns or cities exceeding 5,000 population, in proportion to the amounts of premiums paid by member banks. The experience credit refunds relative to premiums paid on petitioner's insured loans were paid by the association with checks payable to "Ronan State Bank" in the following amounts:

| | | | |
|------|-----------|------|------------|
| 1967 | $478. 47  | 1969 | $269. 19   |
| 1968 | 1, 146. 52 | 1970 | 1, 776. 14 |

The checks were deposited by bank employees in the "Loan Insurance Account" No. 3–0160. Under the constitution and bylaws of the association and the terms of the group policy, the association's remittance of the experience credit refunds during the periods in controversy were not and could not have been paid directly to anyone other than Ronan State Bank and the other bank members of the association.

At various times during the period in controversy and pursuant to terms of the group policy, a part of the total coverage charge collected from a borrower was refunded to the borrower upon his prepayment of the loan. All of these refunds were paid by check drawn on the loan insurance account at Ronan State Bank and signed by Mrs. Akers.

The loan insurance account (No. 3–0160) was petitioner's own internal account rather than an individual depositor's account. The account was credited with the coverage charges to borrowers and the experience credit refunds. This account was debited for refunds of overcharges of borrowers' coverage and for monthly premium payments to the Montana Bankers Association and payments to H. E. Olsson and D. E. Olsson. The annual debits and credits to the account and its opening and closing balances during the years in controversy are as follows:

|  | 1967 | 1968 | 1969 | 1970 |
|---|---|---|---|---|
| Opening balance | $25,174.42 | $21,271.51 | $22,957.46 | $21,128.93 |
| Total receipts (credits) | 22,992.15 | 23,892.46 | 24,109.37 | 27,257.40 |
| Disbursements (debits): |  |  |  |  |
| Borrower refunds | (926.91) | (344.70) | (1,174.61) | (790.24) |
| Payments to Olssons | (8,450.30) | (4,912.67) | (7,157.90) | (6,292.00) |
| Premium payments to association | (17,517.85) | (16,949.14) | (17,605.39) | (18,077.65) |
| Ending balance | 21,271.51 | 22,957.46 | 21,128.93 | 23,226.44 |

The loan insurance account was periodically analyzed and the premiums paid but unearned would be calculated. A reserve for error was calculated and this amount and the calculated premiums paid but unearned were deducted from the account total. The balance was distributed to H. E. Olsson and D. E. Olsson who reported such amounts as commission income on their respective Federal income tax returns in the year received. This balance distributed to the Olssons was attributable to four sources of income: the experience refunds, the 15-cent overcharge on the installment loans, unearned but not refunded charges of $1 or less, and unearned but not refunded charges for fractions of months. The amounts distributed to the Olssons during the years in issue are as follows:

| Year | Experience refunds | Overcharges and other | Total |
|---|---|---|---|
| 1967 | $478.47 | $7,971.83 | $8,450.30 |
| 1968 | 1,146.52 | 3,766.15 | 4,912.67 |
| 1969 | 269.19 | 6,888.71 | 7,157.90 |
| 1970 | 1,776.14 | 4,515.86 | 6,292.00 |
| Total | 3,670.32 | 23,142.55 | 26,812.87 |

Such income distributed to the Olssons was generated through the bank's participation in the group policy as a participating creditor

(policyholder) and did not represent agents' commissions earned on the sale of insurance for New York Life.

The premium refunds paid out of the account referred to were computed by the loan officers and bank employees working with the loan officers. D. E. Olsson analyzed the loan insurance account from time to time and handled transactions with customers including collection of premiums, closing of loans, and refunding of unearned premiums in cases of prepayment, as did other loan officers. All correspondence from the Montana Bankers Association relative to Ronan State Bank's participation under the group policy was directed either to the bank itself or to an individual as an officer of the bank.

Banking corporations in the State of Montana have no power to carry on any business other than banking. Ronan State Bank is prohibited by its articles and bylaws from selling insurance, but the bank is permitted to make creditors' insurance available to its debtors under a special exclusion in the law with respect to creditors' insurance.

Under Montana law, an insurance agent may not share his "Commissions or other compensation received by him" with anyone other than another licensed agent. The insurance commissioner's office in the State of Montana has never defined the meaning of "other compensation."

The time spent by bank employees on the paperwork connected with debtor applications for creditors' life and health insurance under the association's policy is negligible. There is no additional cost to the bank other than postage for such handling.

If D. E. Olsson had been licensed under Montana law as an insurance agent, and had been appointed as an agent for New York Life, he could have sold a group creditors' policy to petitioner as policyholder and collected a single premium for the sale of that group policy. Or, he could have sold individual policies to the bank's debtors and collected a commission on each of those policies.

Respondent, in his statutory notice of deficiency, determined that petitioner received insurance commission income in the amounts of $8,450.30, $4,912, $7,157, and $6,292 during the taxable years 1967, 1968, 1969, and 1970, respectively.

Petitioner, after the assignment, continued to control the capacity to earn the income derived from the creditors' group policy and is taxable on the income from such activities.

OPINION

The only issue remaining for decision is whether income generated through participation in a creditors' group insurance policy was

earned by the petitioner, or by the petitioner's two controlling stock-holders in their individual capacity. Determination of the issue requires our consideration of all the facts and circumstances involved herein.

In his statutory notice of deficiency, respondent states in part as follows:

(1) Insurance Commissions—It is determined that you received Insurance Commission Income in the amounts of $8,450.30, $4,912.00, $7,157.00 and $6,-292.00 during the years 1967, 1968, 1969 and 1970 respectively. This insurance commission income was not reported on your income tax return. * * *

In its petition herein, petitioner assigns as error the determination of the Commissioner that petitioner received insurance commission income for the years and in the amounts set out in the statutory notice. In its statement of facts upon which it relied in support of its assignment of error, petitioner alleged the following:

(a) That H. E. Olsson and D. E. Olsson, two of the petitioner's principal officers, also own and maintain and have for sometime prior to the years in question, owned and maintained an insurance agency through which they sell and have sold creditors' loan insurance. As the agents for the insurance company, H. E. Olsson and D. E. Olsson, sold the creditors' loan insurance in the years in question, collected the premiums and reported their commissions on their individual income tax returns.

Respondent, in his answer, admits that H. E. and D. E. Olsson are two of petitioner's principal officers and denies the remaining allegations set out above. In his opening statement at trial of this case, counsel for petitioner stated that petitioner would establish facts which would show that petitioner effectively assigned its insurance business or its beneficial interest in the group policy to the Olssons, thus precluding imposition of tax on petitioner for income derived from the assigned property. Respondent failed to object or otherwise claim surprise with respect to the theory advanced by petitioner. In his opening statement counsel for respondent stated in part:

Petitioner has taken the position that the bank *assigned its agency* with respect to these group creditor insurance policies *or business* with respect to those policies to the principal stockholders of the Ronan State Bank, Mr. H. E. Olsson and Mr. Donald Olsson. It is Respondent's position that in view of the nature of these group life policies, that the bank was in fact the policyholder and not acting as an agent, did not have an agency business with respect to those policies. Therefore, there was no *agency or business or thing type of property which could produce income so to speak which could even be assigned by the bank to the Olssons.*

*We will take the alternative position that if there was something there that could be assigned, that an effective assignment in fact was not made to the Olssons.*

*And thirdly even if a technical assignment be determined to have been effectuated that it was actually a type of a sham transaction without substance.*

Therefore, the income in question was owned by the bank and not by its principal stockholders, the Olssons. * * *

[Emphasis added.]

Both parties argue in their respective briefs that the income in issue was not commission income. For the first time on brief, respondent objects to petitioner's theory advanced at trial asserting that "it is certainly difficult to construe petitioner's appointment of the Olssons as agents for the insurer an assignment of what it considered its 'insurance business' activities under the group policy."

It is well settled that factual issues not pleaded in the original petition or raised by proper amendment but raised for the first time at trial or on brief will not be considered by this Court. *Frank Polk*, 31 T.C. 412 (1958), affd. 276 F. 2d 601 (C.A. 10, 1960). We are satisfied here that petitioner's statement of facts, contained in its petition, sufficiently apprised respondent of petitioner's theory. Clearly petitioner's statement of facts may be fairly interpreted to allege that petitioner assigned its agency or group insurance related business to the Olssons who thus earned the income in issue. We are convinced that respondent shared this interpretation. Our conclusion is based upon the language of the petition, the opening statement of counsel for respondent, and his failure to object when the trial proceeded on the assumption that petitioner's theory was in issue. All of this convinces us that respondent was neither surprised nor otherwise prejudiced. See *Arthur C. Ruge*, 26 T.C. 138 (1956). Thus, the question of whether petitioner effectively assigned the group insurance business was properly pleaded and before the Court.

Respondent determined that petitioner earned the income in issue under section 61 of the Internal Revenue Code of 1954,[1] and made no attempt to allocate income to petitioner under section 482.

Section 61(a)[2] provides in part that "gross income means all income from whatever source derived." Under that provision, it is fundamental as "the first principle of income taxation: that income must be taxed to him who earns it." *Commissioner* v. *Culbertson*, 337 U. S. 733, 739–740 (1949). The corollary to this basic rule is that the entity earning income cannot avoid taxation by diverting that income to another entity since anticipatory assignments of income are ineffective as a means of avoiding tax liability. *United States* v. *Basye*, 410 U.S. 441 (1973). The Supreme Court, in *Lucas* v. *Earl*, 281 U.S. 111, 114–115 (1930), stated:

There is no doubt that the statute could tax salaries to those who earned them and provide that the tax could not be escaped by anticipatory arrangements and

---

[1] All references are to the Internal Revenue Code of 1954, as amended.
[2] SEC. 61. GROSS INCOME DEFINED.

(a) GENERAL DEFINITION.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

(1) Compensation for services, including fees, commissions, and similar items;

contracts however skillfully devised to prevent the salary when paid from vesting even for a second in the man who earned it. That seems to us the import of the statute before us and we think that no distinction can be taken according to the motives leading to the arrangement by which the fruits are attributed to a different tree from that on which they grew.

In resolving the question of which tree, in fact, bore the fruit, we must ascertain not who has apparent control over the proceeds, *Nat Harrison Associates, Inc.*, 42 T.C. 601 (1964), *Robert P. Crowley*, 34 T.C. 333 (1960), but who has control over the earning of the income. *American Savings Bank*, 56 T.C. 828 (1971). We must look past who received the proceeds or to whom the license or contract was issued to the question of who had control of the source of the income, or stated differently, who was in control of the enterprise or the capacity to produce the income. *R. W. Shaw III*, 59 T.C. 375 (1972). In answering the question of who earned the income, we must consider what was actually done rather than simply the declared purpose of the participants; when applying the income tax laws, regard must be had to matters of substance and not mere form. This preference for substance over form in tax matters extends to claims of petitioner and respondent alike. *J. Leonard Schmitz*, 51 T.C. 306, 317 (1968).

We are satisfied that during the years in issue, petitioner's rights, activities, and liabilities under the group policy constituted an assignable business. Petitioner reasonably believed that local law prohibiting banks from engaging in the insurance business required an assignment of the group insurance business to someone else and apparently thought it effectively did so.[8]

Although the form of the assignment is not unassailable and there is conflicting evidence as to whether petitioner intended to assign the group insurance business to the Olssons as its agents, we find that the assignment was wholly lacking substance. There is no evidence that petitioner was ever relieved of its liabilities under the group policy as a result of the assignment. Moreover, petitioner's activities as a participating creditor under the group policy were never assumed by the

---

[8] Notwithstanding petitioner's interpretation of local law, Montana State banks could, in fact, perform all the services rendered by petitioner in marketing and administering group insurance and lawfully receive experience refunds and amounts of $1 or less as charges for fractional months that were not earned, but were not refundable to borrowers who prepaid loans covered under the group policy. However, local law prohibited the bank from receiving the 15-cent overcharges made on the installment loans. With respect to the overcharges, *Commissioner* v. *First Security Bank of Utah*, 405 U.S. 394 (1972), does not preclude taxing these amounts to the bank who earned them. *R. W. Shaw III*, 59 T.C. 375, 382 (1972). In *First Security*, the Supreme Court rejected an attempt by respondent to use sec. 482 to attribute taxable income to a taxpayer who had allegedly earned it but who had not received the income and who was prohibited by law from receiving such income for services lawfully rendered. Here, as in *Shaw*, respondent relies solely on sec. 61 and under either party's view of the facts, petitioner actually received income with respect to insurance sales. Thus, if petitioner earned and received the improper overcharges, it would be taxable thereon. See *James* v. *United States*, 366 U.S. 213 (1961).

Olssons. While petitioner characterizes the time and cost of its activities as negligible, the fact remains that such activities were all that was required to market and administer the group policy and all these essential services continued to be performed by employees of the petitioner after the purported assignment. There is no evidence that petitioner or its employees were ever employed as agents for the Olssons.

Petitioner retained all of its rights and liabilities under the group policy and continued to perform all of the activities under the policy. That being so, petitioner was clearly in control of the enterprise or the capacity to produce income. *R. W. Shaw III, supra.* Thus, we hold that petitioner earned the income here in issue and it is properly taxable to petitioner. Because we hold that the income in question was generated by the activities of petitioner's employees, it is unnecessary to consider respondent's alternative argument that the income was generated through petitioner's effective ownership of the group policy which it held through its membership in the association.

*Decision will be entered for the respondent.*

