ALABAMA-GEORGIA SYRUP COMPANY, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 82358–82360, 83966, 83967.   Filed July 31, 1961.

[1] Proceedings of the following petitioners are consolidated herewith: W. & W. Pickle and Canning Co., Docket No. 82359; L. B. Whitfield and Virginia G. Whitfield, Docket No. 82360; L. B. Whitfield and Virginia G. Whitfield, Docket No. 83966; and Alabama-Georgia Syrup Company, Docket No. 83967.

*Fred S. Ball, Jr., Esq.*, and *H. C. Kilpatrick, Esq.*, for the petitioners.

*Frederick T. Carney, Esq.*, and *Glen W. Gilson, Esq.*, for the respondent.

Scott, *Judge:* Respondent determined deficiencies in income tax of the petitioners for the years and in the amounts as follows:

| Docket No. | Petitioners | Year | Deficiency |
|---|---|---|---|
| | | *Fiscal year ended Sept. 30—* | |
| 82358 | Alabama-Georgia Syrup Co | 1954 | $15,305.06 |
| | | 1955 | 7,872.60 |
| | | *Fiscal year ended Mar. 31—* | |
| 82359 | W. & W. Pickle and Canning Co | 1955 | 1,027.65 |
| | | *Calendar years* | |
| 82360 | L. B. and Virginia G. Whitfield | 1954 | 4,259.48 |
| | | 1955 | 2,157.20 |
| | | 1956 | 131,449.68 |
| | | *Calendar years* | |
| 83966 | L. B. and Virginia G. Whitfield | 1957 | 3,634.80 |
| | | 1958 | 4,545.67 |
| | | *Fiscal year ended Sept. 30—* | |
| 83967 | Alabama-Georgia Syrup Co | 1957 | 3,961.61 |
| | | 1958 | 12,219.04 |

Although respondent determined no deficiency against Alabama-Georgia Syrup Company for its fiscal year ended September 30, 1956, or against W. & W. Pickle and Canning Company for its fiscal year ended March 31, 1957, these fiscal years of the respective petitioners are involved herein because of claimed loss carrybacks to the fiscal years 1954 and 1955, respectively.

The issues for decision are:

With respect to petitioner Alabama-Georgia Syrup Company: (1) The correctness of respondent's determination that petitioner realized income in its fiscal years 1954, 1955, and 1956 from brokerage commissions paid by its suppliers to one of its stockholders who was also the sister of its president; (2) whether portions of the deductions claimed by petitioner for legal expenses in its fiscal years 1954, 1955, and 1956 were properly disallowed by respondent as representing amounts paid for the benefit of the estate of L. B. Whitfield, Sr., petitioner's major stockholders during those years; (3) whether deductions claimed by petitioner as travel expenses during its fiscal years 1954 through 1958 and expenses of operating and maintaining a recreational center (Alaga Lodge) in its fiscal years 1957 and 1958 were excessive as determined by respondent; (4) whether the salary paid to petitioner's president in 1956, 1957, and 1958 was in excess of a reasonable amount; and (5) whether the cost of remodeling the entrance to petitioner's plant office represented a capital expenditure or a deductible expense for repairs.

With respect to the petitioner, W. & W. Pickle and Canning Company: (1) Whether a portion of the deduction claimed by petitioner in its fiscal year 1955 as legal expense was properly disallowed by respondent as representing an amount paid for the benefit of the estate of L. B. Whitfield, Sr.; (2) whether the deductions claimed by petitioner for executive travel expenses in its fiscal years 1955 and 1957 were excessive.

With respect to petitioners L. B. Whitfield, Jr., and Virginia G. Whitfield: (1) Whether petitioners are taxable on additional income from the estate of L. B. Whitfield, Sr., for the years 1954, 1955, and 1956 as income distributable to them, such amounts consisting in part of income of the estate as shown by its records but not distributed, in part of amounts determined by respondent as additional dividends to the estate because of the legal fees he determined were paid by the corporation on behalf of the estate, and the amount of $165,782.45 for the year 1956 determined by respondent to be distributable income of the estate from the cancellation of indebtedness to the estate by Alabama-Georgia Syrup Company; and (2) whether the amounts paid to petitioners as travel reimbursement by the corporate petitioners and disallowed as a deduction to them by respondent and the amount disallowed by respondent as a deduction to the corporate

petitioners as expenses of operating and maintaining Alaga Lodge represented dividends to petitioners.

FINDINGS OF FACT.

Petitioner Alabama-Georgia Syrup Company (hereinafter referred to as Alaga) is an Alabama corporation with its principal place of business at Montgomery, Alabama. It filed its Federal income tax returns for the fiscal years ended September 30, 1954, 1955, 1956, and 1957 with the district director of internal revenue at Birmingham, Alabama. For the fiscal year ended September 30, 1958, Alaga filed a consolidated return with petitioner W. & W. Pickle and Canning Company (hereinafter referred to as W. & W.). W. & W. is an Alabama corporation with its principal place of business at Montgomery, Alabama. It filed its Federal income tax return for the fiscal year ended March 31, 1955, with the district director of internal revenue at Birmingham, Alabama. Both Alaga and W. & W. keep their books and file their returns on an accural basis of accounting.

Petitioners L. B. Whitfield, Jr., and Virginia G. Whitfield are husband and wife. They reside in Montgomery, Alabama, and filed joint Federal income tax returns for the calendar years 1954, 1955, 1956, 1957, and 1958 with the district director of internal revenue at Birmingham, Alabama. They report their income on the cash basis.

L. B. Whitfield, Sr. (hereinafter referred to as Whitfield), was the founder of both Alaga and W. & W. Alaga was incorporated in the early 1900's and W. & W., in the 1920's.

L. B. Whitfield, Jr. (hereinafter referred to as Louis), and his family have owned, since 1956, all the outstanding stock of Alaga. Louis is now and was during all of the years here involved president of both Alaga and W. & W.

At all times here involved 96.32 percent of the W. & W. voting stock was owned by Alaga.

*Issue 1. Brokerage Commissions.*

In 1950 and for many years prior thereto certain suppliers from whom Alaga purchased substantial amounts of sugar and other raw materials were represented in Montgomery by a broker, Richardson, who was not connected in any way with any of the petitioners herein except as the broker from whom Alaga purchased supplies. Richardson died in 1950, leaving the suppliers he had represented without a broker in Montgomery. For several months after Richardson's death, Alaga purchased its raw materials and supplies directly from the same suppliers at the same prices that it had paid for them when Richardson was the broker and received no form of discount because the suppliers were not paying a brokerage fee.

At the suggestion of Louis, some of the companies who had been represented by Richardson appointed Katherine Wolf (hereinafter referred to as Katherine), Louis' sister, as their broker and agreed to pay her the same rate of brokerage as had been paid to Richardson. At the time she was appointed broker and until January 30, 1956, but not thereafter, Katherine was the owner of a substantial, but not a controlling, amount of Alaga's stock. She was not an officer or employee of Alaga or its subsidiary, W. & W. During 1954, 1955, and 1956 Katherine was appointed broker for several firms that had not been represented by Richardson but from whom Alaga had begun to purchase supplies. The brokerage checks made payable to Wolf Brokerage Company were mailed to Wolf Brokerage Company at the address of Alaga and were deposited to Katherine's bank account. Alaga continued, as it had previously done when Richardson was broker for the various suppliers, to order supplies directly from the selling companies.

In January 1956, when Katherine disposed of her stock in Alaga under circumstances hereinafter set forth, Louis entered into the following agreement with her:

I, the undersigned Louis B. Whitfield, Jr., do hereby agree and bind myself to use my best efforts to prevail upon those who supply Alabama-Georgia Syrup Company and W. & W. Pickle & Canning Company with sugar, cane syrup, and corn syrup to continue to pay Katherine Whitfield Wolf a brokerage on sales of said products to said companies as long as part of the promissory note described in her proposal dated November 30, 1955, remains unpaid and in any event for ten years beginning January 1, 1956, if she lives that long, and in any year in which I should fail to use my best efforts as stated, I will individually pay her any difference between $12,000.00 of commissions and the amount received by her in that year.

The proceeds of the brokerage checks in each of the years here involved were reported by Katherine on her individual income tax returns.

Respondent, in his notice of deficiency, determined that Alaga realized purchase discounts or brokerage commissions in the amount of the brokerage fees paid to Katherine during each of its fiscal years 1954, 1955, and 1956. For the fiscal year 1956 respondent allowed a deduction of $5,552.58 for interest paid by Alaga to Katherine. Alaga realized no income from the brokerage commissions paid to Katherine in its fiscal years 1954, 1955, and 1956 and paid no amount as interest to Katherine in its fiscal year 1956.

## Issue 2. Legal Fees.

For many years prior to his death, Fred S. Ball, Sr., the father of Fred S. Ball, Jr., was the counsel for Alaga and W. & W. After the death of his father, Fred S. Ball, Jr. (hereinafter referred to as Ball), the then senior partner in the Montgomery, Alabama, law firm

of Ball and Ball, became general counsel for Alaga. Sometime prior to 1945, Alaga entered into an agreement with Ball under which Ball was to serve as general counsel for Alaga and its subsidiary, W. & W., and to provide such legal services as they might need for an annual retainer of $4,800 payable in monthly installments of $400 each.

In the notices of deficiency mailed to Alaga and W. & W., respondent has not questioned the reasonableness of the amounts paid to Ball by Alaga and W. & W. for legal services rendered by him.

During the fiscal years 1954, 1955, and 1956 the $400 monthly payment to Ball was charged as legal expense in the amount of $250 per month by Alaga and $150 per month by W. & W. In addition to active services as general counsel for Alaga and W. & W., Ball also served without additional charge as vice president of Alaga and its subsidiary, and as one of the directors of each of these companies and attended the directors meetings and participated in directing the policies and management of the two companies. He was not related by blood or marriage to any of Alaga's stockholders and owned none of its stock except for 1 share necessary to qualify him to serve as a director. Ball and Louis have been lifelong friends.

Ball also performed legal services for Whitfield's estate for which he claimed no compensation from the estate. In 1942 Whitfield died, leaving a last will and testament appointing a corporate bank executor and trustee. In 1943 the corporate executor and trustee resigned and thereupon the court having jurisdiction appointed as its successor four executors and trustees, two of whom were Whitfield's son, Louis, then president of Alaga, and Ball. There were later changes in the executors and trustees due to death and resignation, but Louis and Ball continued as executors and trustees until their discharge by court order on January 30, 1956. The chief asset of Whitfield's estate was 3,200 shares of the then 4,800 outstanding shares (200 additional shares being held in the treasury) of stock in Alaga. The main responsibility of the executors and trustees of Whitfield's estate was that which went with the ownership by the estate of the controlling interest in Alaga. Neither Louis nor Ball received any fees from Whitfield's estate for services as executor and trustee. Ball has continued to receive the annual fee of $4,800 a year from Alaga and W. & W. since 1956 when the executors and trustees of Whitfield's estate were discharged and the estate closed. Ball has many times performed services for Louis without charge therefor.

Respondent disallowed $500, $750, and $250 (part of a total disallowance of $948.41) of the deduction claimed by Alaga for legal fees paid to Ball in its fiscal years 1954, 1955, and 1956, respectively, with the explanation that it had not been established that such amounts constituted ordinary and necessary business expenses or were ex-

pended for the purpose designated. For its fiscal year 1955 respondent disallowed $450 of the amount claimed as a deduction by W. & W. for legal fees paid to Ball with the same explanation as that given for the disallowance to Alaga. The entire amounts paid by Alaga and W. & W. to Ball as legal fees in the respective fiscal years 1954, 1955, and 1956 represented ordinary and necessary business expenses of the respective petitioners.

### Issue 3.   Travel Expenses.

During the fiscal years 1954 through 1958 Louis made frequent trips to various parts of the country on business for Alaga. He paid some of the expenses with his own funds and later received reimbursement from Alaga. During the years 1954 through 1957 Louis accounted for his out-of-pocket travel expenses by determining the difference between what he had in his pocket at the beginning of his trip and what he had left at the end of the trip. This amount was reimbursed to him by Alaga and charged on Alaga's books to executive travel. The amount of the reimbursements and the amount disallowed by respondent were as follows:

| Year | Amount reimbursed | Amount disallowed |
|---|---|---|
| 1954 | $3,009 | $2,000.00 |
| 1955 | 4,228 | 2,500.00 |
| 1956 | 3,118 | 2,500.00 |
| 1957 | 2,085 | 1,042.50 |

The total amounts of executive travel expenses claimed as deductions by Alaga, including the amounts of these reimbursements were $8,906.44, $11,690.32, $11,265.12, and $11,037.52 in the fiscal years 1954, 1955, 1956, and 1957, respectively.

In Alaga's fiscal year 1958 when Louis traveled on business for the company, he carried with him a notebook in which he entered a written account of his expenses while away from Montgomery, and he received reimbursement from Alaga for the amounts shown in this notebook. The total amount so shown was $2,969, of which respondent disallowed $1,424.90. The total amount of deduction for executive travel expenses claimed by Alaga in its fiscal year 1958 including the amount reimbursed to Louis was $10,403.31, of which respondent disallowed a total of $2,289.69, including the amount of the reimbursed expenses disallowed. The notebooks kept by Louis in the year 1958 showed the amounts claimed to be expenses for meals, tips, entertaining, taxi fares, telephone, and miscellaneous. In the years 1954 through 1957 the amounts expended by Louis when traveling for Alaga for which he kept no detailed record were for like items. Louis did not spend any of the amounts for which he claimed reim-

bursement from Alaga for such items as cigarettes, golf games, clothes, or presents for his family. In a separate pocket, he carried with him some money out of which he paid minor personal expenses such as drycleaning. When Louis planned to start on a long trip he would receive a check from the company which he would cash, and after using money for his expenses on the trip would account to the company for the difference. On short trips he often used money that he already had, counting the amount before leaving on a trip and again counting the amount upon his return. He spent all of the amounts so accounted for to Alaga for meals, tips, entertaining business associates, and similar expenses of himself and his wife when she traveled with him. Some of the business associates he entertained while on business trips for Alaga were also entertained by him at other times in his home in Montgomery, but no amount for the entertaining of these business associates in his home in Montgomery was included in the amounts for which he received reimbursement from Alaga.

Louis was accompanied by his wife on three or four of the business trips during each of the years. The total amounts claimed as travel expense deductions by Alaga for its reimbursements to Louis included amounts that Louis spent on expenses for his wife when she was traveling with him. Some of the business trips made by Louis on which he was accompanied by his wife were to conventions. Louis' wife helped him entertain when she accompanied him on business trips. She also sometimes made appointments for him. On certain of the trips made by Louis on which he was accompanied by his wife, he was also accompanied by Alaga's secretary.

The amounts claimed by W. & W. as executive travel expenses for its president in the years 1955 and 1957 and the amounts disallowed by respondent were as follows:

| Year | Amount claimed | Amount disallowed |
|------|----------------|-------------------|
| 1955 | $7,160.78 | $436.75 |
| 1957 | 18,270.83 | 1,089.50 |

In his notice of deficiency respondent explained the disallowance of the deduction to Alaga in each of its fiscal years 1954 through 1958 and to W. & W. in its fiscal years 1955 and 1957 as not being an allowable deduction for the reason that it had not been established that such an amount constituted an ordinary and necessary business expense or was expended for the purpose designated. The total amounts spent by Louis for his own meals, entertainment, taxi fares, and other miscellaneous expenses for which he received reimbursement from Alaga in each of its fiscal years 1954 through 1958 were

ordinary and necessary business expenses of Alaga, but the amounts spent for such items for Louis' wife when she traveled with him do not constitute ordinary and necessary business expenses of Alaga. The amount of such expenses of Louis' wife included in the deduction claimed by Alaga in each of its fiscal years 1954 through 1958 is $1,000. The evidence fails to show that the amounts of executive travel expenses disallowed to W. & W. by respondent in its fiscal years 1955 and 1957 constituted ordinary and necessary business expenses of W. & W.

## Issue 4. Salaries.

When Louis was in high school, he began to work during the summers at the Alaga plant, and he continued working there in the summer while a student in college and until he received his college degree. After graduating from college he became a full-time employee of Alaga. He first worked in the factory, later in the bookkeeping department, then as assistant secretary and treasurer and as vice president. At the time of his father's death in 1942, he was president of both Alaga and W. & W., and has continued as president of both companies from that time until the present. He has devoted his full time to the business of the two companies throughout this entire period except during the time of World War II when he was serving on active duty as an Army officer. Louis' father drew a salary of $31,320 a year as chairman of the board of Alaga and W. & W. in 1942, the year of his death. For its fiscal years 1954, 1955, 1956, 1957, and 1958, Alaga paid to Louis as salary and claimed a deduction therefor, the amounts of $32,500, $30,000, $55,000, $45,000, and $55,000, respectively. Louis was paid no salary by W. & W. during these years. Louis generally works 5½ days a week, usually beginning work at 7:30 a.m. to 8 a.m. and working to approximately 6 p.m., Monday through Friday, and working at least one-half day on Saturday. He has no hobbies or interests other than his business.

The plants of Alaga and W. & W. occupy a 10-acre tract in Montgomery, Alabama, and W. & W. has another plant of 3 acres in Dallas, Texas. In 1956, the two plants employed at varying times from a minimum of 343 employees to a maximum of 523; in 1957 from a minimum of 408 to a maximum of 703; and in 1958 from a minimum of 320 to a maximum of 544.

From the plants of Alaga and W. & W., products are shipped into 36 States. There are approximately 25 salesmen and 47 brokers working for the companies. The main product of Alaga is syrup and of W. & W., pickles, and each company has different problems of procurement, manufacture, and sales. In Alaga's business cane syrup must be obtained from growers in the fall to be blended with corn syrup and sugar in the manufacture of the various brands

of syrup which Alaga makes. These syrups are sold in a highly competitive market. In order to obtain its raw materials, W. & W. must contract with the growers of cucumbers for acreage to supply its requirements for the manufacture of pickles. The cucumbers grown in various areas have to be assembled, cured in brine, manufactured, and sold. Louis, as president, actively participates in and directs the procurement, manufacture, and sale of the products of both companies.

In 1954, two vice presidents of the companies died, and it was necessary for Louis to train replacements for them. In August 1954, the vice president in charge of sales had a heart attack, and in December of that year one of the vice presidents of W. & W. had an accident. The incapacity of these two men for a long period of time required Louis to take on additional duties. In 1955 the secretary and treasurer of the companies retired, and Louis did most of the work in training someone to replace him. Louis works closely with all of the companies' vice presidents in advising them and making the major decisions with respect to the procurement, manufacture, and sale of the products of both companies.

The average gross yearly combined sales of Alaga and W. & W. for the 5-year period ended September 30, 1942, were $1,484,592.10. The average gross yearly combined sales of Alaga and W. & W. for the 5-year period ended September 30, 1956, were $4,713,791. The average yearly combined earnings of Alaga and W. & W. during the 5-year period ended September 30, 1942, were $39,860.42, and for the 5-year period ended September 30, 1956, $161,653.77.

Alaga and W. & W. declared no dividends for the 5-year period ended September 30, 1942. For the 5-year period ended September 30, 1956, the average yearly dividends declared were $25,920. Alaga paid dividends of $48,000 in 1954 and $24,000 in 1955. No dividends were paid in 1956, 1957, and 1958.

On its income tax returns Alaga reported a loss of $117,754.35 for the fiscal year ended September 30, 1956, and net income of $110,234.65 and $202,226.66 for the fiscal years ended September 30, 1957 and 1958, respectively.

Alaga's earned surplus, as shown on its income tax returns for its fiscal years ended September 30, 1956 through 1958, was as follows:

| Fiscal year ended Sept. 30— | Earned surplus |
|---|---|
| 1956 | $824, 351. 90 |
| 1957 | 949, 333. 75 |
| 1958 | 1, 081, 654. 26 |

In 1944, the year before Louis returned from his active service in the Army, Alaga's gross sales were $1,015,407.39 and in 1956 Alaga's gross sales were $3,044,286.31.

Alaga's ratio of current assets to current liabilities declined substantially between 1945 and 1955.

John A. Miller, president of Brown-Miller Company which manufactures pickles and mustard, pickles representing about 99 percent of the company's business, received a salary in each of the years 1956, 1957, and 1958 in excess of $55,000 a year. Miller received a salary of over $55,000 a year when sales of the company of which he was president were less than $6 million a year. He was not a stockholder of Brown-Miller Company. The main office of Brown-Miller Company where Miller is employed is New Orleans, Louisiana. Miller had been a vice president of Alaga prior to 1946 when he left Alaga to become employed by Brown-Miller Company.

Gurley H. Williams, Jr., is vice president in charge of sales of Alaga and W. & W. He has been connected with these companies since 1947 and previously was connected with a brokerage business, and prior to that was with the General Foods Sales Company of New York. In 1956 the salary paid to Williams by Alaga and W. & W. was not quite half of the salary paid to Louis; in 1957 and 1958 it was approximately one-half and in 1959, considerably over one-half.

In 1942, the last year of Whitfield's life, there were six executive officers of Alaga and W. & W. with total salaries of $67,060, of which $31,320 was paid to Whitfield. In 1956 the total number of executives of Alaga and W. & W. was five and the total salaries of these officers were $100,746.23, of which $55,000 was paid to Louis.

Louis was influenced in not having Alaga increase his salary in 1954 and 1955 by the fact that although he was in control of the company, his sister, Katherine, owned approximately as much stock in the company as he did and friction had developed between them to the point that he had decided to sell his stock in the corporation unless he could arrange for the redemption of Katherine's stock.

Respondent disallowed $12,500, $2,500, and $12,500 of the deductions claimed by Alaga for salary paid to Louis in its fiscal years 1956, 1957, and 1958, respectively, with the explanation that the compensation was determined to be excessive to this extent since $42,500 is determined to be a reasonable amount for salary or other compensation for personal services actually rendered by him. The salaries of $55,000, $45,000, and $55,000 paid by Alaga to Louis in its fiscal years 1956, 1957, and 1958, respectively, are reasonable compensation for services actually rendered by Louis to Alaga in each of these years.

## Issue 5. Alaga Lodge.

During its fiscal years 1957 and 1958 Alaga owned and maintained on Lake Mitchell, which is in Chilton County, Alabama, about 45 miles from Montgomery, a recreational facility known as Alaga

Lodge. It had owned and maintained this facility for more than 20 years. The property was first bought by Louis' mother and father about 35 years ago in order that people working for the company and business associates and customers could have a place to go for picnics and barbecues. There are signs all the way from the main highway to the lodge with Alaga and W. & W. shown thereon, as well as the direction to be taken to the lodge. At the entrance of the lodge there is an iron inscription across the top reading, "Alaga and W. & W. Lodge." Once or twice a year big parties are held at the lodge for company employees and their families.

On a number of occasions various civic organizations and church groups have been permitted to use the lodge. These organizations provide their own food on such occasions. There is a lodge, a guest-house, caretaker's house, and a boathouse where company boats are kept and where Louis' sons keep their own boats and motor. The company keeps a guest book each year which is signed by the people who go to the lodge. The guest book is always signed by business associates and customers and the employees who go to the lodge generally sign the book two or three times a year but not on every visit. The lodge is available at all times for use of the executive and supervisory employees of Alaga and W. & W. There are about 100 employees of the two companies in this group. The lodge is available for their use if they clear through the office their desire to use it, and some of the employees use the lodge with their families almost every weekend and sometimes during the week. Louis personally never used the lodge except to entertain customers or prospective customers.

For the fiscal year 1957 Alaga deducted $6,887.60 expenses with respect to Alaga Lodge, consisting of $3,254.37 upkeep and maintenance and $3,633.23 depreciation. Respondent disallowed $4,476.94 or 65 percent of this claimed deduction with the explanation that this amount had not been established to be an ordinary and necessary business expense or to have been expended for the purpose designated. For the fiscal year 1958 Alaga deducted upkeep and maintenance expenses of $7,161.84 and depreciation on buildings and equipment of $3,153.19. Respondent capitalized $1,484.69 and expended for shrubbery included by Alaga in upkeep and maintenance expense and added 10 percent of this amount, or $148.47, to depreciation. After this adjustment, respondent showed the total expenses applicable to Alaga and W. & W. for Alaga Lodge to be:

| | |
|---|---:|
| Upkeep and maintenance (Alaga) | $5, 677. 15 |
| Depreciation (Alaga) | 3, 341. 66 |
| Depreciation (W. & W.) | 112. 04 |
| | 9, 130. 85 |

Respondent disallowed $5,935.05 or 65 percent of the expenses attributable to Alaga Lodge after the shrubbery adjustment, with the explanation that this amount had not been established to be an ordinary and necessary business expense or to have been expended for the purpose designated.

## Issue 6. Factory Repairs.

Prior to 1958 the entrance to Alaga's plant in Montgomery was wooden. The front door to this entrance had rotted and been eaten by termites. During its fiscal year 1958, Alaga expended $1,961.85 to remodel the entrance and replace the wooden door with an aluminum one. Alaga deducted this amount as a repair. The respondent disallowed this deduction on the ground that it was a capital expenditure subject to depreciation.

## Issue 7. Estate Distribution.

The will of Whitfield, after directing his executors to pay the expenses of his last illness and burial and his just debts as soon as possible, provided for certain specific bequests for the disposition of his personal effects and household goods and for educational trusts for his grandchildren; and with respect to the remainder of his property, provided as follows:

All the rest, residue and remainder of my property of whatsoever kind and wheresoever situated, I give, devise and bequeath unto The First National Bank of Montgomery, (and to such successor corporation having trust powers as shall succeed to the business of said Bank by purchase, merger, consolidation or change of charter or name), as Trustee, in trust nevertheless for the uses and purposes, upon the terms and conditions, and with the powers and duties hereinafter stated.

(a) The Trustee shall hold and manage said property and such other property as it may subsequently acquire pursuant to the power and authority herein given to it (all of which for convenience will hereinafter be referred to as "trust estate"), with full power to compromise, adjust and settle in its discretion any claim in favor of or against said trust estate, collect the income therefrom and from time to time to sell at public or private sale, to convey, exchange, lease for a period beyond the possible termination of the trust, or for a less period, improve, encumber, borrow on the security of, or otherwise dispose of, all or any portion of said trust estate, without the necessity of the order of any court, in such manner and upon such terms and conditions as said Trustee may approve, and with full power to invest and reinvest said trust estate and the proceeds of sale or disposal of any portion thereof, in such loans, securities or other property, real or personal, as to said Trustee may seem suitable, and to change investments and make new investments from time to time as to said Trustee may seem necessary or desirable. * * *

* * * * * * *

(g) This trust shall continue and be administered by my said trustee herein named for a period of ten (10) years from and after my death, but said trust

may be continued for the same purposes and under the same terms and conditions for such additional time as may be determined by the consent and approval of the residuary trustee and my son, Louis, or in the event of his death, the parties who shall have succeeded to his interest in said trust. During said period of ten (10) years, and such additional time as same may be extended, my trustee shall estimate and set up adequate reserves each year to cover estimated expenses of administration, including, among others, all taxes, municipal assessments against real estate, insurance premiums, repairs and all other legitimate charges and expenses, and said fund shall be adjusted by the trustee from time to time as may be expedient.

(h) Said trustee is hereby directed to pay, from the income of said trust, beginning as soon after my death as is practicable, the sum of One Hundred and Fifty and no/100 ($150.00) Dollars per month to my daughter, for her sole use and benefit. By making this special provision for my daughter, Katherine, it is not my purpose to favor her over my son, Louis, but I am mindful of facts and circumstances which are not set out herein but are well understood by Katherine and Louis, and also of the advantages which Louis has had from his connection with the two business enterprises, and I feel that this special provision for her will to some extent equalize their participation in my estate.

(i) My trustee is hereby directed to divide equally between my son, Louis, and my daughter, Katherine, the residue of said net income during the continuance of said trust, said distributions to be made at such periodical intervals as my trustee shall determine; and in the event of the death of my son Louis prior to the termination of this trust, his interest in said distributions shall be paid for the duration of said trust to the parties designated by and in accordance with his last will and testament. In the event he fails to make provisions for the distribution of said income in his last will and testament, then my trustee shall, until the termination of said trust, pay said incomes as follows, to wit; to Virginia Goodwin Whitfield, one-half, and the other half to be held and used by said trustee for any living child or children of her and my son Louis; and in the event any part of said income shall accumulate and be undistributed upon the arrival of each of said children at the age of twenty-five years, the interest of such child in said fund shall be forthwith distributed to him upon his arrival at the age of twenty-five years.

In the event my daughter Katherine shall die prior to the termination of this trust, her interest in said income for the duration of said trust shall be retained and used by my trustee for the maintenance, support and benefit of her child or children; and in the event any part of said income shall accumulate and be undistributed upon the arrival of each of said children at the age of twenty-five years, the interest of such child in said fund shall be forthwith distributed to him upon his arrival at the age of twenty-five years.

(j) Upon the expiration of ten (10) years from and after the date of my death, unless further extended as herein authorized, and in that event upon the expiration of such extension, this trust shall terminate, and the net corpus of said trust estate shall thereupon be distributed as follows:

(1) Said trustee shall, upon the expiration of said period, pay over and deliver to my son Louis one half of the net corpus of said estate, to be his absolutely and in fee simple forever. In the event my son Louis is dead as of said date, said trustee shall pay over and deliver to his wife, Virginia, a one-fourth part of his interest, absolutely, and the residue of his interest shall be held by said trustee and administered in accordance with the terms and provisions hereof, and the income used as it and the mother of said children may deem best for the children of my son Louis, and as each of them arrives at the age of twenty-five years, his interest in the corpus shall be paid to him.

(2) Said trustee shall, upon the expiration of said period, pay over and deliver to The First National Bank of Montgomery, as Trustee for my daughter Katherine, the remaining one-half of the net corpus of said estate, same to be administered by said trustee under the same powers and duties and with the same rights and authority and with like exemptions as hereinabove conferred upon my residuary trustee, until the arrival of my daughter Katherine at the age of sixty years, and said trustee shall during said period pay to her semi-annually the net income therefrom. Upon her arrival at the age of sixty years, this trust shall terminate and the trustee shall forthwith pay over and deliver to her the corpus of said trust estate.

At the time of his death, Whitfield was indebted to Alaga in the amount of $331,564.90. This debt consisted of three open accounts shown on Alaga's ledger sheets and three promissory notes. Whitfield's estate did not at any time have cash sufficient to pay this indebtedness. Within the time allowed by Alabama law, a claim for the $331,564.90 was filed on behalf of Alaga in the offices of the Judge of Probate of Montgomery County, Alabama, where the will was probated and the estate originated.

The major portion of the residuary estate consisted of 3,600 shares of Alaga's stock. On November 30, 1955, Katherine had become 60 years of age and at that time she and her two sons, all of whom had shares of Alaga stock which they had received from Whitfield, made a proposal to sell their Alaga stock. Under this proposal Katherine agreed to accept from Alaga in redemption of all her Alaga stock, both that she then owned as well as her stock in the residue of the Whitfield estate, in full settlement of her half of the residue of the estate and in full settlement of all her interest in the estate, $605,000, payable partly in cash and partly in installments without interest over a period of 17 years for which Alaga's non-interest-bearing promissory notes were to be given to her. Her two sons also made proposals for the redemption of their stock in Alaga. The proposal also provided that Louis would execute and deliver to Katherine a written agreement to use his best efforts to have Alaga's suppliers continue to pay Katherine brokerage commissions, the complete provision being in accordance with the agreement executed by Louis in January 1956, as heretofore set forth. The proposals made by Katherine and her two sons were acceptable to Alaga and Louis, and were submitted to the court supervising the administration of the estate and approved by that court which rendered its decree on January 30, 1956. This decree is in part as follows:

2. The executors and trustees have fully paid and discharged all of the debts of the testator except as herein stated and have satisfied all bequests except only the use of $1000.00 for the purchase of an appropriate article for delivery to Frank Goodwin Whitfield, herein for brevity called Frank, when he becomes twenty-one years of age, and the distribution of the residue of the estate to the said residuary legatees and the time for said distribution as provided for in said will has expired.

3. The said residue consists of 3200 shares of the corporate stock of Alabama-Georgia Syrup Company, herein for brevity called Alaga, 40 shares of the corporate stock of W. & W. Pickle & Canning Company, certain policies of insurance on the life of Louis not necessary to further describe here, and an amount of cash funds which are not more than sufficient to pay the court costs and expenses of closing the estate, all of which are subject to an unpaid indebtedness of $331,564.90 which was owing to Alaga by the testator at the time of his death which the estate has never had sufficient funds to pay and none of which has been paid. The said 3200 shares of Alaga stock represents the controlling interest in that corporation of which the total outstanding stock is 4800 shares. All of the stock of said corporation other than the said 3200 shares is owned by Louis and his wife, Virginia, and his two sons, L. B. Whitfield, III and Frank, and by Katherine and her two sons, Broughton Whitfield Delaplane, herein for brevity called Whitfield, and William Vandiver Wolf, herein for brevity called Vandiver.

4. Since the said residue cannot be distributed without the payment of the said indebtedness to Alaga and the estate does not have funds with which to pay said indebtedness or any prospect thereof, Katherine and her two sons have submitted a written proposal dated November 30, 1955, a copy of which is attached to said petition as an exhibit, by which she proposes to accept in full settlement of her half of the said residue and of all interest in the estate, 1600 shares of Alaga stock and as a part of the settlement to surrender said stock to Alaga and all other Alaga stock owned by her for the redemption price of $605,000.00 payable as follows:

| | |
|---|---|
| Initial payment | $68,760.00 |
| 16 annual payments of $31,880.00 | 510,080.00 |
| Final payment | 26,160.00 |

5. Included in the proposal is an offer by Katherine's two sons, each of whom is of legal age, to likewise surrender all their respective holdings of Alaga stock for redemption. Whitfield offers his 184 shares for $76,952.00 payable as follows:

| | |
|---|---|
| Initial payment | $ 8,620.00 |
| 16 annual payments of $4060.00 each | 64,960.00 |
| Final payment | 3,372.00 |

6. Vandiver offers his 156 shares for $54,000.00 payable in one payment which is at a discount for cash.

7. Louis is willing to accept in full settlement of his share of the residue the remaining assets of the estate subject to the administration expenses, the indebtedness of the estate, and is willing to deposit $1000.00 with the Register of this court to be held for payment of the said bequest to Frank.

8. All of the Alaga stockholders other than Katherine and her two sons have executed written consents, the originals of which are attached to the petition as exhibits, by which they each consent that distribution may be made and redemption effected as set out in the said proposal. Alaga has also consented to said proposal by its written consent hereto attached.

9. The proposal is to the interest of all of the parties concerned and is now approved by the court.

    *       *       *       •       *       *       *

It is accordingly ORDERED, ADJUDGED AND DECREED:

A. The executors and trustees are authorized and directed to accept the said proposal and to consummate it in accordance with its terms by first making

distribution of the assets of the estate to the said Katherine and Louis as residuary legatees. Said distribution shall be effected by distributing and having issued to Katherine a certificate for 1600 shares of Alaga stock issued to her in her name and by distributing to Louis a similar certificate in addition to the remaining assets of the estate as provided in said proposal, and it appearing to the court that the corporation has issued its stock certificate Number 254 for 1600 shares to Katherine and has issued 1600 shares to Louis in stock certificate Number 255, and said certificates being delivered in open court.

IT IS, THEREFORE, FURTHER ORDERED, ADJUDGED AND DECREED that the redemption of the Alaga stock distributed to Katherine, same being certificate Number 254, shall be effected by Alaga in accordance with the terms of the proposal by her surrendering the said stock certificate for 1600 shares of stock for that purpose, and the acceptance of the said proposal shall thereupon be fully consummated in accordance with its terms.

And it further appearing to the court that the executors and trustees of the estate of L. B. Whitfield, deceased, have fully carried out all the terms of the will and of the trust set up therein and that there is no further need for said trust or said estate to be continued,

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that Louis B. Whitfield, Jr., J. N. Chisholm and Fred S. Ball, Jr. be and they are hereby discharged as executors and trustees of the said L. B. Whitfield estate.

DONE this 30 day of January, 1956.

Prior to entry of this decree, Louis deposited with the register of the court the sum of $1,000 and shortly after the entry thereof, the remaining assets of the estate including the 40 shares of W. & W. stock were distributed to Louis.

Alaga, on March 31, 1956, redeemed the shares of stock of Katherine and her sons as set forth in the proposal. After the estate settlement and stock redemption, neither Katherine nor her sons were any longer stockholders of Alaga, but she and one of her sons then became creditors of Alaga.

The price paid by Alaga for the purchase of its common stock from Katherine and her sons was computed as follows:

Amount paid by Katherine W. Wolf:

| | |
|---|---:|
| Book value of each share of Alaga stock—3/31/55 | $415.52 |
| × number of shares owned by K. W. Wolf_____shares | 1893 |
| = total value of K. W. Wolf's stock | $787,579.36 |
| Less: One-half of debt of Whitfield estate | $165,782.45 |
| = net value of K. W. Wolf's stock | $620,796.91 |
| Amount to be paid K. W. Wolf by mutual agreement | $600,000.00 |
| Add: Amount mutually agreed upon to compensate K. W. Wolf for the earnings of the company from the date negotiations began until the completion of the final contract | $5,000.00 |
| Total amount to be paid Katherine W. Wolf | $605,000.00 |

Amount paid Vandiver Wolf:

| | |
|---|---:|
| Book value of each share | $415.52 |
| X number of shares owned by Vandiver Wolf_____shares | 156 |
| = total value of Vandiver Wolf's stock | $64,821.12 |
| Less: Discount for cash payment | $10,821.12 |
| Total amount to be paid in cash | $54,000.00 |

Amount paid B. Whitfield Delaplane:

| | |
|---|---:|
| Book value of each share | $415.52 |
| X number of shares owned by B. W. Delaplane_____shares | 184 |
| = total value of B. W. Delaplane's stock | $76,455.68 |
| Add: Amount mutually agreed upon to induce B. W. Delaplane to sell his stock ($500 reduced to amount which would bring total contract to even amount) | $496.32 |
| Total amount to be paid B. Whitfield Delaplane | $76,952.00 |

Neither at the time of the redemption of Katherine's Alaga stock in 1956 nor at any other time were any entries made on the books of Alaga with respect to the cancellation of the indebtedness of $331,564.90 owed to the company as a result of loans made to Whitfield. The Probate Court records show that the claim filed in 1943 by Alaga for this indebtedness has never been canceled.

The book value of the 4,800 shares of Alaga's stock outstanding on March 31, 1955, was $415.52 per share.

Alaga's earned surplus, as shown on its income tax returns for its fiscal years ended September 30, 1953 through 1955, was as follows:

| Fiscal year ended | Earned surplus |
|---|---:|
| 1953 | $805,674.82 |
| 1954 | 845,928.29 |
| 1955 | 952,702.32 |

The balance sheet of Whitfield's estate as prepared by its accountant for its fiscal year ended November 30, 1954, showed the following beginning balance, receipts, disbursements, and ending balance:

| | | |
|---|---:|---:|
| Beginning balance | | $9,478.11 |
| Dividends from Alaga received | | 30,409.00 |
| Total to account for | | 39,887.11 |
| Disbursements: | | |
| Federal income tax 11-30-53 | $6,118.96 | |
| Trustee's fees | 4,200.00 | |
| Paid on Frank Whitfield trust | 2,508.75 | |
| Paid account owing L. B. Whitfield III | 3.30 | |
| Paid life insurance premium on policies owed by the estate on the life of L. B. Whitfield, Jr. | 556.25 | |
| Bookkeeper, legal and audit fees | 470.88 | |
| Flowers and cemetery care | 302.28 | |
| Distributed to Louis | 10,400.00 | |
| Distributed to Katherine | 10,400.00 | |
| Total disbursements | | 34,960.42 |
| Cash balance at the end of the year | | 4,926.69 |

The fiduciary returns of the estate were filed on the cash basis.

Whitfield's estate was still in the process of administration at the end of its fiscal year 1954 and $4,926.69 of income shown on its fiduciary return for that year was retained because there were expenses including the income tax of the estate which had not been paid and which would be due in the following year. The actual payments made by the estate in the following year including the payment of a cash bequest were $4,182.02.

In his notice of deficiency to Louis for the years 1954 and 1955, respondent determined that Louis had unreported income consisting of income distributable to him by the Whitfield estate in the amounts of $4,564.56 and $600, respectively. Respondent in his notice determined that one-half of the entire net income of the Whitfield estate was distributable to Louis in each of these years. In his notice of deficiency to Louis for the years 1954 and 1955 respondent stated that the distributable income of the Whitfield estate was computed by adding to the amount of estate income shown on the estate's fiduciary return for its fiscal years ended November 30, 1954 and 1955, the amounts of $1,000 and $1,200, respectively, as dividends which represented the legal fees disallowed to Alaga and W. & W. and charged as income to the Whitfield estate, and for the fiscal year 1954 the amount of $50 representing an adjustment in the dividend exclusion of the estate. Respondent, in his notice of deficiency to Louis for the year 1956 stated that no fiduciary return had been filed by the estate for the period December 1, 1955, through January 30, 1956, that there was fiduciary income of the estate consisting of a dividend of $898.41 ($250 of which represented legal fees disallowed to Alaga) and cancellation of indebtedness of $331,564.90, and determined that one-half of each of these amounts, or a total of $166,231.65 was includible in Louis' income as income distributable to him by the Whitfield estate.

Respondent increased the income of Louis for the years 1954 and 1955 in the amounts of $4,564.56 and $600 as income from the estate of L. B. Whitfield with the explanation that these amounts were determined to represent his share of the distributable income of the estate for the taxable years ended November 30, 1954 and 1955. For the year 1956 respondent increased Louis' income by $166,231.65 with the explanation that such amount represented his share of the distributable income of the estate of L. B. Whitfield for the period December 1, 1955, through January 30, 1956.

The attorney fees paid to Ball by Alaga and W. & W. in 1954, 1955, and 1956 were not for the benefit of Whitfield's estate and do not constitute dividends to the estate. The petitioner has not shown that the amount of $648.41 determined by the respondent to be a dividend to Whitfield's estate for the period December 1, 1955, through Janu-

ary 30, 1956, was improper. The amount of $165,782.45 represented income of Whitfield's estate from cancellation of indebtedness for the period December 1, 1955, through January 30, 1956, distributable to Louis and was properly included by respondent in Louis' income for the year 1956.

Some of the facts have been stipulated and are found accordingly.

OPINION.

### Issue 1. Brokerage Commissions.

It is respondent's contention that even though the brokerage commissions were paid by various companies by checks drawn to Wolf Brokerage Company, these commissions were in substance paid to Alaga and distributed by Alaga as dividends to Katherine in Alaga's fiscal years 1954, 1955, and 1956. It is respondent's contention with respect to the portion of Alaga's fiscal year 1956 during which Katherine was not a stockholder of Alaga but held its non-interest-bearing notes that the brokerage commissions were in substance paid to Alaga and paid out by Alaga as interest to Katherine. Respondent thus argues that the entire amount of brokerage commissions paid by checks drawn to Wolf Brokerage Company during Alaga's fiscal year 1956 should be included in Alaga's income and an interest deduction allowed to Alaga for the portion of that year subsequent to January 30, 1956.

It is Alaga's contention that it did not in any form receive the brokerage commissions, that it derived no benefit either directly or indirectly from the payment of such commissions, and, therefore, no amount should be included in its income because of the commissions paid to Katherine. We agree with petitioner's contention. The evidence is clear that the system of buying supplies when Richardson was acting as broker for the various companies was not changed after Katherine became the broker. It is also clear from the evidence that Alaga neither paid a lesser price nor received any greater discount on supplies purchased during the short period of several months after Richardson's death and before Katherine was appointed broker than it did while Richardson was broker or while Katherine was broker. It is completely clear from the evidence that it was at the suggestion of Louis that his sister was appointed broker for companies from which Alaga purchased supplies, and it is a fair inference that Louis would be quite influential in persuading the suppliers to appoint Katherine broker in Montgomery, since Alaga was a large purchaser of materials sold by the various suppliers. The stipulated facts as well as Louis' testimony are unequivocal that he did suggest that Katherine be appointed broker and his testimony is that his reason for doing so was to help his sister. Cer-

tainly, no inference can be drawn that his assistance to Katherine was in any way to the detriment of Alaga to which Louis was responsible as its chief executive officer, since whether Katherine, no one, or someone else was appointed broker in Montgomery, the price of the supplies to Alaga was the same. Louis testified that he entered into the agreement of January 1956 to pay personally to his sister $12,000 a year in any year in which he did not use his best efforts to have Katherine continued as broker for Alaga's suppliers and her brokerage commissions were less than that amount, for the purpose of helping his sister. This agreement was required by the terms of Katherine's proposal to have Alaga redeem her stock. Louis was dissatisfied with Katherine as a large stockholder of Alaga to such an extent that he planned to sell his stock to some larger company if Katherine refused to have her stock redeemed. These facts create an inference that assisting his sister was not Louis' sole purpose in making the agreement of January 1956, a further purpose being to influence Katherine to agree to redeem her stock. However, this motive on the part of Louis for giving a personal guarantee does not cause the commissions to be income to Alaga where the evidence is clear as it is here that Alaga itself could not have received this income.

Respondent argues that Katherine rendered no services to Alaga for the receipt of the brokerage fees. Even if we assume that Katherine never rendered any services to Alaga, it does not follow that the payments of the brokerage fees were in substance made to Alaga. Since the brokerage fees were paid by various suppliers from whom Alaga purchased materials, Katherine's services, if any, should have been rendered to the suppliers. Since Alaga continued to purchase from the suppliers that Katherine represented and purchased from several additional suppliers who appointed Katherine broker and from whom it had not purchased supplies while Richardson was broker, Katherine at least rendered sufficient services to the suppliers to keep or obtain Alaga as a customer. It is a fair inference that Louis directed business to suppliers for whom Katherine was broker, but this fact does not require a conclusion that the income from the brokerage commissions was in substance that of Alaga. Cf. *Robert P. Crowley*, 34 T.C. 333 (1960).

The situation here is not, as respondent contends, in substance the receipt by an individual of a commission or benefit equal thereto on an item that he, himself, purchased. It was Alaga that purchased the supplies and Katherine who received the commissions. Because of this fact, the instant case is distinguishable from *Commissioner* v. *Minzer*, 279 F. 2d 338 (C.A. 5, 1960), reversing 31 T.C. 1130 (1954), on which respondent relies.

We hold that respondent was in error in including the brokerage commissions paid to Katherine in Alaga's income. It thus follows that for its fiscal year 1956, Alaga is not entitled to an interest deduction for any amount as interest paid to Katherine.

### Issue 2. Legal Fees.

During Alaga's fiscal years 1954, 1955, and 1956, Whitfield's estate was the owner of a majority of its stock and Ball served as executor, trustee, and attorney for the estate without charge for his services. Respondent contends that these facts create an inference that a portion of the fees paid by Alaga and its subsidiary, W. & W., to Ball were for services rendered to the estate. The record negatives such an inference. For many years prior to 1954 Ball had been the attorney for Alaga and W. & W. at a yearly retainer of $4,800 payable $400 per month, and he continued as attorney for Alaga and W. &. W. under this same arrangement after his discharge as executor and trustee of Whitfield's estate on January 30, 1956. Ball's father had been counsel for Alaga prior to his death, and after his death, Ball became Alaga's general counsel. Ball and Louis had been lifelong friends. Neither Ball nor Louis, who was also executor and trustee of Whitfield's estate, claimed any fees for services to the estate. Ball also acted as a director and vice president of Alaga and W. &. W. without any charge in addition to his retainer of $4,800 a year as general counsel for Alaga and W. & W. It is stipulated that respondent does not contend that the amount of $4,800 paid to Ball as general counsel of Alaga and W. & W. was unreasonable in amount.

We hold that Alaga and W. & W. are entitled to deduct in full the legal fees paid by them to Ball in their fiscal years 1954, 1955, and 1956.

### Issue 3. Travel Expenses.

Louis traveled extensively during the years 1954 through 1958 for Alaga and W. & W. In the years prior to 1958, Louis kept no written record of his expenditures but would note the money he had when he left on a trip and what he had remaining when he returned and claim reimbursement for the difference as the amount spent for travel. These amounts were reimbursed to Louis by Alaga and charged as executive travel expense. There is no evidence of what constituted the amounts charged as executive travel expenses by W. & W. Louis testified that he traveled 30,000 to 40,000 miles a year on necessary business for Alaga. He further testified that he checked carefully the money he took with him to defray expenses when he traveled and that all the money that was reimbursed to him by Alaga was for necessary out-of-pocket expenses incidental to his travel. He kept some money

separated with which he paid such personal expenses as laundry or drycleaning bills. In 1958 he kept a detailed record in notebooks of his expenditures under the various categories of meals, entertaining, taxi fares, telephone, and miscellaneous and this formed the basis of his reimbursement by Alaga in that year.

On three or four trips a year, Louis was accompanied by his wife. No claim is made by petitioner that her expenses in each such year were not included with his when he reported his expenses to Alaga and received reimbursements therefor. There is no showing of any specific services that Louis' wife rendered when she accompanied him on a trip. The testimony is that she made some appointments for him and helped him entertain. However, on some of these trips, Louis was accompanied by Alaga's secretary as well as his wife. There has been no showing of any services rendered by Louis' wife on the various trips that could be considered ordinary and necessary expenses of Alaga. The evidence in the instant case at most supports a finding that Louis' wife was helpful to him when she traveled with him, but does not support petitioner's contention that her services were necessary to Alaga. A taxpayer is not entitled to deduction for travel expenses of an officer or employee's wife when her travel is not necessary to the taxpayer's business even though her services may be helpful to her husband. Cf. *L. L. Moorman*, 26 T.C. 666, 679 (1956).

Respondent does not contend that all of the amounts disallowed by him were for expenses of Louis' wife. There is no basis in the record for a precise determination of the exact amount expended for the travel of Louis' wife. From the testimony that she traveled with Louis three or four times a year, and weighing heavily against petitioner for the deficiencies in the evidence, we sustain respondent's disallowance to Alaga of travel expenses to the extent of $1,000 in each of the years as representing unallowable deductions for travel of Louis' wife.

For the fiscal years 1955 and 1957, deductions for executive travel expenses were also disallowed to W. & W. Since there is insufficient evidence to show for what the amounts disallowed by respondent as travel expenses to W. & W. were expended, we sustain respondent's disallowance of these amounts for W. & W.'s fiscal years 1955 and 1957.

On the basis of the evidence which shows that Louis' expenditures for his meals and incidental traveling expenses were ordinary and necessary expenses for the business of Alaga, we hold that Alaga is entitled to the deduction for the amounts reimbursed to Louis and included in the deduction for executive travel expenses claimed by it in each of the years 1954, 1955, 1956, 1957, and 1958, except to the extent of $1,000 for each year.

*Issue 4.  Salaries.*

In our findings we have set forth in some detail the duties performed by Louis as president of Alaga and W. & W.  On the basis of these facts we hold that the salary paid to Louis in each of the years 1956, 1957, and 1958, by Alaga was a reasonable amount for personal services actually rendered by Louis to Alaga.

The facts do show, as respondent contends, that many of the additional duties taken over by Louis were assumed in 1954 and 1955 and that his salary was not increased until 1956 after he and his immediate family became the sole stockholders of Alaga.  Louis, in his testimony, admitted that his conflict and disagreement with his sister, who prior to January 30, 1956, was also a large stockholder of Alaga, could be the reason why his salary was not increased prior to 1956.  His testimony was that his disagreement with his sister had reached the point that it was disrupting the organization of the companies to the point that had his sister been unwilling to dispose of her stock interest in Alaga, he had intended to sell his stock to some larger company.  The fact that Louis' duties increased at a time when stockholders' arguments were such that even though he was in control of the company he did not have the company raise his salary does not mean that the increased salary in subsequent years was unreasonable.

We have also noted respondent's contention that Alaga paid no dividends in its fiscal years 1956, 1957, and 1958.  The dividends paid by Alaga in 1954 were twice the amount paid in 1955, the year before Louis' salary was increased.  The year 1956 was a loss year.  Considering all the facts we do not agree with respondent that they create any inference that any part of the increased salary paid to Louis was in reality a distribution of dividends.  We have also noted that the evidence offered deals in many incidents with Louis' services to both Alaga and W. & W.  Although he received his salary entirely from Alaga and was not compensated by W. & W. we recognize that Alaga is not entitled to deduct as its business expense any amount paid to Louis for services he rendered to W. & W.  It is clear from the evidence that Alaga was the larger company and that Louis' services were primarily for the benefit of Alaga.  The evidence with respect to Louis' extensive travel deals entirely with travel performed for Alaga.  Miller who testified in behalf of petitioner as to his salary and his opinion as to a reasonable salary for Louis as president of both Alaga and W. & W. was president of one company, the business of which was 99 percent in one product.  Miller received over $55,000 a year salary as president of this one company when his company's sales were less than $6 million.  The evidence as a whole shows that the amounts paid by Alaga to Louis

in its fiscal years 1956, 1957, and 1958 were reasonable compensation for services rendered by Louis to that company.

We hold that Alaga is entitled to a deduction of $55,000, $45,000, and $55,000 in its fiscal years 1956, 1957, and 1958, respectively, as compensation to Louis for services rendered.

### Issue 5. Alaga Lodge.

No evidence was offered by Alaga with respect to the shrubbery placed at Alaga Lodge during its fiscal year 1956 at a cost of $1,484.69. Respondent capitalized this amount and determined that it was depreciable over a 10-year period. For failure of proof on petitioner's part, we sustain respondent with respect to this item.

After making this adjustment to the expenses of Alaga Lodge as claimed by petitioner, respondent determined that in each of the fiscal years 1957 and 1958, 65 percent of the expenditures should be disallowed. The respondent's contention is that the lodge was used by Louis and his family for personal purposes and that 65 percent of the expenses of maintaining the lodge should be allocated to expenditures for the personal benefit of Louis and his family. The evidence is clear that the lodge was used exclusively for business purposes except to the extent that the keeping of their boats and motor at the lodge by Louis' sons might be considered a personal use. Petitioner Alaga argues that Louis as president of the company was an employee and that since all employees of the company had free use of the lodge for themselves and their families, the fact that his sons kept their boats and motor at the lodge does not indicate that their use was personal and not for a business purpose of Alaga. The testimony shows that company boats were kept at the lodge, presumably for the use of company personnel as well as customers and other business guests who were entertained there. However, there is no indication that the sons of any other company officials or supervisory personnel were permitted to keep boats at the lodge. From this we infer that the keeping of their boats and motor at the lodge by Louis' sons was a personal use of the lodge. There is no basis in the record to make a precise allocation of the portion of the expenses which should be attributed to the personal use of the lodge for the benefit of Louis' family occasioned by his sons' maintaining their personal boats and motor at the lodge.

Weighing heavily against petitioner for this failure of proof, we hold that 10 percent of the expenses including upkeep, maintenance, and depreciation of the facilities of Alaga Lodge, was for the personal benefit of Louis and his family in each of the fiscal years 1957 and 1958 and is not properly allowable as a deduction to Alaga. The balance of the expenses of Alaga Lodge represented an ordinary and necessary business expense of Alaga.

## Issue 6. Factory Repairs.

All that the evidence shows with respect to the repairs of the Alaga plant is that termites had eaten the wooden door at the plant's entrance and it had become rotted necessitating its replacement. It was replaced with an aluminum door and a new entrance at a cost of $1,961.85. The evidence does not show the useful life of the new entrance and door, but from the fact that the door was aluminum, it is clear it would be more than 1 year. This evidence is insufficient to show that the expenditure did not prolong the life and add to the value of the building. We, therefore, sustain respondent in the disallowance of the amount as a repair and hold that the amount is properly to be capitalized and distributed over its useful life. Cf. *H. S. Crocker Co.*, 15 B.T.A. 175, 182 (1929), holding new windows to be a capital expenditure.

## Issue 7. Estate Distribution.

The only evidence offered by petitioners with respect to whether the entire income of Whitfield's estate in 1954 was distributable to the beneficiaries was the testimony of the estate's accountant that the $4,926.69 balance retained in the estate and not distributed in that year was because there were other expenses which had not been paid and which would be due in the next year. The estate was still in the process of administration and there were amounts which had to be paid, one of which was the income tax. The evidence indicates that the fiduciary return was filed on the cash basis. There is no evidence to show that any reserve for expenses which would not be due until the next year was necessary or proper. The evidence does not show the prior practice with respect to reserves or the anticipated income, if any, of the estate in the year 1955. Cf. *Frick* v. *Driscoll*, 129 F. 2d 148 (C.A. 3, 1942).

Whitfield's will specifically directed that after a payment of $150 a month from the trust income to Katherine beginning as soon after his death as practicable, the net income of the trust which consisted of the residuary estate be distributed equally to Louis and Katherine. The intent of the will that the trust consisting of the residuary estate be set up as soon as practical after the testator's death is clear. The record is devoid of evidence whether the residuary estate had ever been transferred to the trust and if not, why not. The stipulated facts and the order of the court supervising the administration of the estate show that the executors and trustees were the same. The estate had been in the process of administration since 1942. In this state of the record, we hold that the net income of the estate in 1954 was in fact also the trust income and was properly distributable to Louis and Katherine although the estate and trust should have been separate

entities. Cf. *Estate of Peter Anthony Bruner*, 3 T.C. 1051, 1055 (1944). Because of our previous holding with respect to the attorney fees, there is no amount of income to be added to the income of the estate in either 1954 or 1955 as dividends because of payments of attorney fees by Alaga and W. & W. to Ball. Therefore, there is no additional income of the estate distributable to Louis in 1955.

For the period December 1, 1955, to January 30, 1956, no evidence was offered with respect to dividend income in the amount of $898.41 (except the $250 legal fee paid to Ball considered as a dividend to the estate) determined by respondent to have been received by the Whitfield estate and to be distributable to Louis and Katherine. Therefore, respondent is sustained with respect to this item except to the extent of $250.

The other item of income of the estate for the period December 1, 1955, to January 30, 1956, determined by the respondent, was an amount of $331,564.90 which respondent determined represented cancellation of indebtedness, one-half of which, $165,782.45, he determined represented ordinary income of the estate distributable to Louis. It is stipulated that the $331,564.90 represented an indebtedness of Whitfield to Alaga at the date of his death. It is clear from the evidence that although a claim was filed with the estate by Alaga, the indebtedness has not been paid by the estate. The record does not show whether the indebtedness of Whitfield to Alaga was shown as a liability of Whitfield's estate on its Federal estate tax return or in fact whether such a return was filed. However, since the parties are agreed that there existed a bona fide indebtedness of Whitfield to Alaga in the amount of $331,564.90 at the date of his death, presumably this liability was shown on the Federal estate tax return if one were filed.

It is well settled that where the original withdrawal of moneys from a corporation by a stockholder is a loan, a subsequent cancellation of the loan constitutes a dividend to such stockholder. *Wiese* v. *Commissioner*, 93 F. 2d 921 (C.A. 8, 1938), affirming 35 B.T.A. 701.

In *Genevra Heman*, 32 T.C. 479 (1959), affd. 283 F. 2d 227 (C.A. 8, 1960), we recognized the cancellation by a corporation of a decedent stockholder's indebtedness for the redemption of stock to constitute a distribution essentially equivalent to a dividend resulting in distributable income to the decedent's estate. Similarly in the instant case, if Alaga is considered to have canceled an indebtedness which would have resulted in income to Whitfield if he were living, such cancellation would likewise result in income to his estate. Whitfield's liability to Alaga continued in his estate as did the ownership of the controlling amount of Alaga stock. In substance this is the same as if the original loans by Alaga had been made to its stockholder, Whitfield's estate.

Petitioner contends, however, that under the facts of the instant case, there was no cancellation of indebtedness of the estate to Alaga.

Respondent argues that the substance of the transaction here, whereby the estate was closed by the distribution of one-half of its Alaga stock to Katherine with approval of an offer by her that her stock be redeemed at a price representing approximately book value less one-half of the outstanding indebtedness of Whitfield's estate to the corporation and the other half of the estate stock to Louis "subject to the indebtedness," constituted a cancellation of the indebtedness of the estate.

Whitfield's will provided for the creation of a trust with the residue of his estate after payment of his debts and certain specific bequests. From this provision it would appear that at some juncture the assets constituting the residue of the estate should have been transferred from the executors to the trustees, even though the same persons served in both capacities. The record is silent as to whether such a transfer was made, or, if so, when and how Whitfield's indebtedness to Alaga was provided for at the time of such transfer. The court order of January 30, 1956, refers to the "executors and trustees" and recognizes that the 3,200 shares of Alaga stock are part of the residuary estate and that all the residue of the estate is subject to the indebtedness of Whitfield to Alaga in the amount of $331,564.90. Under this state of the record, we must assume that the estate and trust have been treated by the executors and trustees as one entity and upon this assumption consider whether the estate's indebtedness to Alaga was canceled.

In considering whether the full amount of the indebtedness was canceled the question arises whether the agreement which Katherine had entered into with Alaga and Louis, with the approval of the court having jurisdiction over Whitfield's estate, to have Alaga redeem the 1,600 shares of Alaga stock to be distributed to her by the estate at a price equal to the book value of the stock less amounts including one-half of the estate's indebtedness to Alaga, was in effect a payment of one-half of the estate's indebtedness. The fact that the stock was distributed to Katherine prior to its redemption and she subsequently redeemed the stock pursuant to the previous agreement approved by the court, leads us to conclude that this transaction did not constitute a payment of any part of the debt by the estate. The offer of Katherine to have Alaga redeem her stock was in effect a settlement between her and Louis with the approval of Alaga as to the final distribution of the estate.

Upon consideration of all the facts of record we agree with respondent that the closing of the estate on January 30, 1956, under the circumstances here present, in substance, constituted a cancellation of

the indebtedness of the estate to Alaga and resulted in income to the estate in the full amount of the indebtedness, $331,564.90.

The final distribution of the assets of the estate was made when a certificate for 1,600 shares of Alaga stock was distributed to Katherine and the remaining assets of the estate to Louis. The amounts to be paid to Katherine and her two sons in redemption of their Alaga stock, arrived at prior to the distribution of the assets of the estate, indicate that the prices thereof were negotiated based upon the assumption that the indebtedness of Whitfield's estate to Alaga did not represent a true asset of Alaga. The Alaga stock owned by the estate was itself sufficient to pay the indebtedness and there also were other assets in the estate. In view of this fact the treatment of this indebtedness as not representing a true asset of Alaga by all interested parties was, in substance, an agreement by Alaga through its stockholders to cancel the indebtedness. Louis did not assume the indebtedness and is not personally liable therefor. He took his Alaga stock subject to the indebtedness but since he now owns directly or indirectly all the stock of Alaga the number of shares of such stock outstanding is immaterial to him. It is clear from the fact that Louis assumed no personal liability for the indebtedness that he does not intend to personally pay it. The court order of January 30, 1956, disposed of the estate assets in a manner which clearly indicates that the indebtedness of Whitfield's estate to Alaga would never be paid and this, in effect, constituted a cancellation by Alaga of that indebtedness.

Since the amount of the indebtedness when incurred was a loan from Alaga to Whitfield, it was never includible in his income. It was an indebtedness of the estate which was a claim upon the assets of the estate. Although the estate never had cash sufficient to pay this indebtedness, it had the controlling interest in Alaga and Alaga, at least from its fiscal year ending September 30, 1953, had sufficient earned surplus to declare a dividend sufficient to pay this indebtedness. The record does not disclose Alaga's earned surplus prior to the fiscal year ending September 30, 1953. Thus, so far as the record shows, Alaga at all times had sufficient earned surplus to declare a dividend sufficient to pay the indebtedness. Had Alaga directly declared a dividend to its stockholder, Whitfield's estate, and credited the amount of the indebtedness, no question would exist but that the estate received income to the extent of the dividend declared. Under these circumstances the book value of the stock would have been proportionately reduced and Katherine would have received upon redemption of her stock approximately the same amount as she, in fact, did receive. The only difference would be that there would have been unquestioned income to the estate. Cf. *Marie Minor Sanborn*, 33

B.T.A. 1120, 1123 (1936), affd. 88 F. 2d 134 (C.A. 8, 1937), certiorari denied 301 U.S. 700 (1937).

Petitioner suggests, without argument, that perhaps prior to January 30, 1956, the statute of limitations had run on this indebtedness, but the facts show that a timely claim was filed by Alaga for the indebtedness and that the indebtedness was recognized in the court order of January 30, 1956. Petitioner argues that there was no personal liability on either Louis or Katherine to pay the debt and that, therefore, a cancellation of indebtedness could not constitute income to either of them. Accepting petitioner's contention in this regard does not change the fact that there was a liability on the estate to pay the indebtedness and that cancellation of the indebtedness to the estate constituted income to the estate. We are not persuaded by petitioner's argument that the books of Alaga still show the indebtedness as outstanding and the notes as uncollected, or the argument that no action was taken by Alaga's directors authorizing the cancellation or discharge of the indebtedness. Louis was at all times in control of Alaga and after the redemption of the stock of Katherine and her sons, which was agreed to and approved prior to January 30, 1956, when the trustees and executors of the estate were discharged, directly or indirectly owned all the stock of Alaga. Under such circumstances book entries and actions of directors are of little probative force. Treatment of accounts on the corporate records is not controlling when such treatment is contrary to the realities of the transaction. Cf. *William C. Baird*, 25 T.C. 387, 397 (1955). In form this indebtedness was not canceled, in substance, it was.

This leaves for consideration the question whether one-half of the income of Whitfield's estate occasioned by the cancellation of its indebtedness to Alaga was distributed or distributable to Louis. Petitioner does not contend that if Whitfield's estate had income from the cancellation of the indebtedness, one-half of such amount is not taxable to Louis, and respondent in his argument does not explain upon what basis he determined that one-half of the income of Whitfield's estate from the cancellation of indebtedness was Louis' share of the distributable income of Whitfield's estate. It appears to us that this question is governed by the provisions of sections 661, 662, and 663 of the Internal Revenue Code of 1954 [2] dealing with estates

[2] SEC. 661. DEDUCTION FOR ESTATES AND TRUSTS ACCUMULATING INCOME OR DISTRIBUTING CORPUS.

(a) DEDUCTION.—In any taxable year there shall be allowed as a deduction in computing the taxable income of an estate or trust (other than a trust to which subpart B applies), the sum of—

(1) any amount of income for such taxable year required to be distributed currently (including any amount required to be distributed which may be paid out of income or corpus to the extent such amount is paid out of income for such taxable year) ; and

(2) any other amounts properly paid or credited or required to be distributed for such taxable year ;

and trusts which may accumulate income or which distribute corpus. Insofar as here pertinent these sections provide that estates or trusts may deduct to the extent of distributable net income, the sum of distributable income and any other amounts properly paid or credited and such amounts must be included in the beneficiary's income to the extent of his pro rata portion of the distributable net income of the estate unless the distribution is in payment of a specific bequest of the estate. The definition in respondent's regulations [3] of a specific bequest excludes a residuary estate or the corpus of a trust. This regulation is a reasonable interpretation of the statute. The distributable income of the estate is defined in section 643 of the Internal Revenue Code of 1954 [4] as the taxable income of the estate with modifications not here pertinent.[5] It, therefore, follows that since the $331,564.90 cancellation of indebtedness is income to the estate, one-half thereof is taxable to Louis under the provisions of section 662(a)(2) of the Internal Revenue Code of 1954 since an amount in excess thereof was distributed to him from the corpus of the estate during the year 1956.

---

but such deduction shall not exceed the distributable net income of the estate or trust. SEC. 662. INCLUSION OF AMOUNTS IN GROSS INCOME OF BENEFICIARIES OF ESTATES AND TRUSTS ACCUMULATING INCOME OR DISTRIBUTING CORPUS.

(a) INCLUSION.—Subject to subsection (b), there shall be included in the gross income of a beneficiary to whom an amount specified in section 661(a) is paid, credited, or required to be distributed (by an estate or trust described in section 661), the sum of the following amounts

(1) AMOUNTS REQUIRED TO BE DISTRIBUTED CURRENTLY.—The amount of income for the taxable year required to be distributed currently to such beneficiary, whether distributed or not. * * *

(2) OTHER AMOUNTS DISTRIBUTED.—All other amounts properly paid, credited, or required to be distributed to such beneficiary for the taxable year. If the sum of—

(A) the amount of income for the taxable year required to be distributed currently to all beneficiaries, and

(B) all other amounts properly paid, credited, or required to be distributed to all beneficiaries

exceeds the distributable net income of the estate or trust, then, in lieu of the amount provided in the preceding sentence, there shall be included in the gross income of the beneficiary an amount which bears the same ratio to distributable net income (reduced by the amounts specified in (A)) as the other amounts properly paid, credited or required to be distributed to the beneficiary bear to the other amounts properly paid, credited, or required to be distributed to all beneficiaries.

SEC. 663. SPECIAL RULES APPLICABLE TO SECTIONS 661 AND 662.

(a) EXCLUSIONS.—There shall not be included as amounts falling within section 661(a) or 662(a)—

(1) GIFTS, BEQUESTS, ETC.—Any amount which, under the terms of the governing instrument, is properly paid or credited as a gift or bequest of a specific sum of money or of specific property and which is paid or credited all at once or in not more than 3 installments. For this purpose an amount which can be paid or credited only from the income of the estate or trust shall not be considered as a gift or bequest of a specific sum of money.

[3] Sec. 1.663(a)-1(b)(2)(iii), Income Tax Regs.

[4] SEC. 643. DEFINITIONS APPLICABLE TO SUBPARTS A, B, C, AND D.

(a) DISTRIBUTABLE NET INCOME.—For purposes of this part, the term "distributable net income" means, with respect to any taxable year, the taxable income of the estate or trust computed with the following modifications—

[5] Subsec. (a)(4) of sec. 643 dealing with extraordinary dividends is not applicable to secs. 661 and 662 covering among other things final distributions by estates and trusts.

Prior to the enactment of sections 661, 662, and 663 of the Internal Revenue Code of 1954, the estate was entitled to deduct, and the beneficiary was required to include in income, only distributions of income by the estate. *Dunlop* v. *Commissioner*, 165 F. 2d 284 (C.A. 8, 1948), affirming a Memorandum Opinion of this Court, and cases cited in footnote 2 therein. If the tax as determined against the estate could not be collected therefrom because of a prior distribution of its assets, the distributee was liable for the tax due by the estate as a transferee to the extent of the assets received by him upon the distribution of the estate. Cf. *Marie Minor Sanborn*, 39 B.T.A. 721 (1939), affd. 108 F. 2d 311 (C.A. 8, 1940). However, sections 661 and 662 of the Internal Revenue Code now allow the estate in a year when the corpus thereof is distributed to deduct the amount of corpus so distributed to the extent of the estate's distributable net income and the recipient thereof is required to include in his net income for the year in which the distribution is received the amount of distribution so received to the extent of his pro rata share of the distributable net income of the estate.

We sustain respondent in his determination that there should be included in Louis' taxable income for 1956 the amount of $165,782.45 representing distributable income of Whitfield's estate resulting from cancellation of the indebtedness by Alaga to the estate.

To the extent that we have held amounts paid by Alaga and W. & W. for travel and by Alaga for lodge expenses to be for personal expenses of Louis and his family and not proper deductions for the corporation, we sustain respondent in his determination that such amounts should be included in Louis' income as dividends. *Alex Silverman*, 28 T.C. 1061, 1064 (1957) and cases therein cited, affd. 253 F. 2d 849 (C.A. 8, 1958).

Certain other issues originally raised in the pleadings have been disposed of by agreement between the parties.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

MULRONEY, *J.*, dissenting: If the deficiency in Issue 7 is being upheld on the ground of cancellation of an indebtedness I feel no more than one-half of the debt of $331,564.90 was forgiven. The computation in the complicated transaction whereby Alaga acquired Katherine's stock shows one-half of the debt was subtracted from the admitted proper value of her stock.